Per Curiam :
This case comes before the court on defendant’s motion, filed January 7,1974, for judgment requesting that the court adopt, as the basis for its judgment in this case, the recommended decision of Trial Judge Philip E. Miller, filed November 14, 1973, pursuant to Eule 134(h), plaintiffs having failed to file a notice of intention to except thereto as provided by Eule 141(a) and the time for so filing pursuant to the Eules of the court having expired. Upon consideration thereof, without oral argument, since the court agrees with the trial judge’s recommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case, granting defendant’s said motion for judgment. Therefore, it is concluded that plaintiffs are not entitled to recover and their petition is dismissed.
OPINION OE TRIAL JUDGE
Miller, Trial Judge:
This is a suit for just compensation under the fifth amendment to the Constitution for the taking by the United States of two tracts of land in Saipan, Mariana Islands. Saipan is now a part of the Trust Territory of the Pacific Islands, of which the United States is trustee under a delegation from the United Nations. Joint Ees. July 18, 1947, ch. 271, 61 Stat. 397. The taking is an outgrowth of *251 events originating in World War II. The land was originally owned by Joaquin Lizama, who was killed during the invasion of Saipan by American Military Forces in 1944. Plaintiffs are his surviving children and sole heirs.
During the period between the two World Wars Saipan was governed by Japan, for most of such period under the authority of a mandate from the League of Nations. It was a source of agricultural products for Japan, primarily sugar and copra. At the start of World War II the native population numbered about 3,500. Although the Japanese imported several thousand additional civilian workers from Japan and Okinawa, the government also recognized the rights of the local people in their land and by regulation prohibited the alienation of such land to others unless approval was first obtained from the Director of the South Seas Bureau which administered such territory. However, this did not bar the expansion of a large Japanese agricultural corporation, Nanyo Kohotsu Kabushiki Kaisha (N.K.K.), which at the time of the invasion had acquired ownership of about 28 percent of the privately-owned land, and leased a great deal more.
World War II resulted in a great upheaval in the entire property structure of the island. First, to prevent the use of the island as a staging point for an attack on Japan the Japanese Military Establishment took over much of the land for purposes of fortification, airfields, ammunition and equipment storage, and the stationing of 30,000 Japanese troops. Second, the fury of the American invasion and fighting thereafter resulted in the destruction of most structures, boundaries and land records. United States Military Forces invaded Saipan on June 15, 1944 after a 4-day bombardment. When the fighting ended, 29,000 of the 30,000 Japanese soldiers on the island were dead, as were 400 Saipanese. Almost all of the buildings and landmarks used for surveys and cadastral maps were levelled. Third, the local people were then removed from their land, confined in a relatively small fenced-in area and kept in protective custody until July 1946, a period of 2 years. They were not permitted to leave such area except under guard, for work details or other special purposes. Fourth, in preparation for the invasion of Japan practically the entire island was reconstructed with paved roads, air *252 strips, huge fuel and ammunition dumps, warehouses, pipelines, power lines, military quarters and training areas for up to 200,000 American troops. Hardly a square foot of the island remained undisturbed. Finally, after the conclusion of the war, the reconstruction of the island and the continued American presence necessitated retention of much of the land and structures for military and public purposes, irrespective of prewar ownership and prewar boundaries of the particular tracts.
While both the United States Military Government and the Trust Territory Government, which succeeded it in 1947 under the United Nations trusteeship, recognized the right of pre-existing private property, all of the public land office records, including the survey maps, were lost and nearly all of the individual monuments marking the corners of land parcels were missing. After the end of the war it became very difficult to reconstruct ownership of land and prewar boundaries thereof. Thus when the local people regained their freedom and new maps were drawn, it became necessary for them to file claims to ownership of individual tracts, with very few having any documents to prove ownership.
On December 29,1947 the Deputy High Commissioner for the Trust Territory executed Trust Territory Policy Letter P-1 prescribing land policy to be followed in the administration of the territory. The policy letter reaffirmed the principle of private land ownership for the native population so that families might have means of subsistence. It stated that decisions by the prior Japanese administration as to land ownership and rights prior to Japan’s resignation from the League of Nations, on March 27, 1935, would be considered binding. However, transfers thereafter to non-natives would be subject to review. They would be considered valid unless the sales were not made of free will and just compensation was not received. In the latter event title would be returned to former owners upon paying to the Trust Territory Government the amount previously received by the former owners from the transferees.
The policy letter also reaffirmed the policy of the United States to pay compensation to private owners for property required for public use. And it further stated a preference *253 for compensating sncli owners by exchange of public land rather than by cash so that the citizenry not be landless.
Trust Territory Office of Land Management Regulation No. 1, originally issued January 11, 1951, provided for the filing of a claim by every person claiming an interest in land used or occupied by the United States. A title officer was authorized in each district to determine, after due notice and hearing, the ownership of any tract of land in the district used, occupied or controlled by the government and to appraise, evaluate and recommend for settlement any claim for damages resulting from the taking. Where an estate was claimed jointly or in common by the heirs of a deceased owner and where no executor or administrator had been appointed, the regulation provided for the district land officer to appoint one or more of the claimants to act as trustee or trustees for the group in connection with all matters having to do with land return and claims. However, he was forbidden to sell or otherwise dispose of land except with the approval of all parties having an interest therein or of the High Court. Appeal from the determination of the district land title officer to the Trial Division of the High Court of the Trust Territory was authorized within one year and the latter could in its discretion hear the case de novo or on the prior record before the title officer.
The two tracts of issue herein are:
(1) Lot nos. 591, 592, 593 and 594, South District, located at Kobler Field, As Perdido, Saipan (hereinafter referred to as the As Perdido tract). The area of the property is uncertain and measures from 6.8 to 8.0 hectares.[1] This property has remained in the possession and under the control of the defendant since 1944. At some time prior to 1950 the Navy Department constructed an airfield, Kobler Field, and related buildings thereon, and the Trust Territory Government has continued to use it for such purpose.
(2) Lot no. 1387, Garapan District, Saipan, consisting of 1 hectare. This has also been in the possession and under the control of the United States since 1944. The Navy Department constructed various buildings and a paved road on the *254 property, and the Trust Territory Government has continued to use it for the same purposes.
The plaintiffs have been aware of such occupation and usage by the defendant since it occurred, and plaintiffs have not attempted to occupy either property since 1945.
The original claims with respect to both tracts of land at issue were filed by Carmen M. Lizama, widow of Joaquin Lizama. Claim 59-A, filed January 4, 1945, covered the As Perdido property and stated that the area was about 8 cho. (A cho is a Japanese area measure equivalent to slightly less than 1 hectare.) Claim 75-A, filed January 10,1945, covered the Garapan property, and described it as having an area of 1 cho.
Carmen having died in 1946, at some time between 1950 and 1952, Trust Territory officials called Veronica Lizama Camacho, daughter of Joaquin and Carmen, to the Land and Claims Office to question her about the claim to the As Perdido property. There, after some discussion, she executed a paper conceding that the property had previously been sold by her father to a Japanese corporation, the N.K.K. company, although her mother had not known it, and accordingly the property did not belong to the heirs of Carmen M. Lizama. At trial Veronica attempted to repudiate this statement claiming that she did not understand English and that she had only signed a small blank piece of paper without any writing on it. However, there were two witnesses to her execution of the document, Judge Gregorio T. Camacho and Henry S. Pangelinan, an official of the Land and Claims Office. Their testimony establishes that the document was typewritten before Veronica signed it and that she engaged in a half-hour’s discussion with officials in the office in the Chamorro language before she executed the document.
On December 29,1952, the Title Officer for the Saipan District filed a Determination of Ownership stating that, “after due public notice and private notice to all parties as of record, and after public hearings at which all persons claiming an interest in the [As Perdido property] were given full opportunity to be heard,” he had determined that the land in question was “the property of the government of the Japanese mandated territory and is now vested in the Area Prop *255 erty Custodian[2] for the Trust Territory of the Pacific Islands pursuant to the vesting order dated September 27, 1951”. Accordingly he released the land and gave immediate possession to the custodian. Plaintiffs failed to file any appeal from such determination of the Title Officer to the High Court within one year as permitted by Regulation No. 1.
On July 16,1953, the same title officer issued the determination that the Garapan property, consisting of 1 hectare, was “the property of the heirs of Joaquin Lizama represented by Jose M. Lizama as land trustee”, but he denied them possession because the land was part of a United States retention area. Following such determination of ownership, on December 30,1954, Jose M. Lizama on behalf of the heirs of Joaquin Lizama, deceased, as land trustee, entered into a written agreement with the Trust Territory Government for the exchange of the Garapan property for other public property. It is not clear from the record whether Jose’s delegation by the other heirs to act as land trustee on their behalf in the presentation of the claim was sufficient to authorize his entering into the exchange agreement.
Pursuant to the exchange agreement, on February 5,1958, the Trust Territory Government tendered deeds to the heirs of Joaquin Lizama represented by Jose Lizama, but he refused to accept such deeds and both he and the other heirs refused to execute a quit claim deed for the Garapan property. Jose’s explanation for such refusal was that the deeds tendered him were not in accordance with his oral agreement with the representative of the Trust Territory Government. He understood he was to receive a larger tract for himself and that each of the other heirs was to receive an individual house lot. He claimed that the written agreement did not reflect the oral understanding, that he did not understand English and that the written agreement was not translated.
On June 29, 1966 plaintiffs brought two suits in the Trial Division of the High Court of the Trust Territory, entitled, J ose M. Lizama, et al., Plaintiffs v. Elias P. Sablan, District Land Title Officer, Defendant, Civil Action Nos. 174 and 175, invoking the original jurisdiction of such court to try all *256 causes involving the adjudication of title to land. In the first action plaintiffs claimed both compensation and return of the As Perdido property stating that they had claimed such property from the Trust Territory Government in 1954, without success. In the second action plaintiffs made similar claim with respect to the Garapan property. In both, the defendant moved to dismiss with prejudice because (a) the court lacked jurisdiction of the suit, no appeal having been taken from the title determination; (b) plaintiffs had failed to join an indispensable party, the government of the Trust Territory, which had not consented to be sued; (c) an appeal from the title determination was barred by the 1-year limitation period prescribed by Land Management Regulation No. 1 in each case;'and (d) the complaint lacked certainty in that it failed to describe the land. In addition, the defendant contended that the first suit should be dismissed because the plaintiffs’ father had sold the property in 1938 to a Japanese corporation, and the second suit should be dismissed because the plaintiffs had agreed to exchange the land for other land. After oral argument, on October 31, 1966, the High Court entered orders dismissing both suits without prejudice and without opinion. Plaintiffs filed no appeal to the Appellate Division of the Pligh Court.
Plaintiffs contend that the determination of the land title officer in 1952 that the As Perdido property was owned by a Japanese corporation (and hence was vested in the Alien Property Custodian) was invalid because notice of hearings on plaintiffs’ claims had not been given to the plaintiffs, in violation of Land Management Regulation No. 1. They also assert that there is doubt as to whether the sale by plaintiffs’ father to the Japanese corporation in 1938 had actually taken place; that if it occurred, it may only have involved a part of the tract; and that the consideration paid by the Japanese corporation was inadequate.
With respect to the Garapan property plaintiffs contend that the 1954 exchange agreement between Jose Lizama and the Trust Territory Government is null and void because they did not consent to the exchange, and that such consent is required under Land Management Regulation No. 1.
*257 Defendant does not challenge the plaintiffs’ position that the United States Constitution guarantees just compensation to an alien for the taking of property in a foreign country. This was decided as a matter of first impression in Turney v. United States, 126 Ct. Cl. 202, 215, 115 F. Supp. 457, 464 (1953), and adverted to in Seery v. United States, 130 Ct. Cl. 481, 483-84, 127 F. Supp. 601, 603 (1955.) (involving foreign property of an American citizen). Nor for purposes of this case does defendant question whether the Constitution requires compensation for the post-hostilities failure to return foreign property taken from aliens in enemy territory during a war, although the matter may not be wholly free from doubt.[3] However, under the view we take of this case, that plaintiffs are not entitled to recover in any event, it is unnecessary to decide such question.
Defendant urges primarily that this action is barred by the statute of limitations, 28 U.S.C. § 2501, since both properties at issue were taken by the United States more than 6 years before suit was filed. Second, defendant contends plaintiffs are collaterally estopped by the 1966 decisions of the High Court of the Trust Territory which they failed to appeal to the Appellate Division of the High Court. Third, defendant asserts, plaintiffs were not in fact the owners of the As Perdido property, since their father had sold it to the Japanese corporation in 1938. And, fourth, defendant avers, plaintiffs’ claim to compensation for the Garapan property was satisfied by the exchange agreement and plaintiffs have simply refused to accept the substitute land.
It is decided herein that plaintiffs’ petition must be dismissed because it is barred by the statute of limitations. Title 28 U.S.C. § 2501 provides in pertinent part: “Every claim of which the Court of Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.” This requirement is jurisdictional and *258 cannot be waived by the United States. United States v. Wardwell, 172 U.S. 48 (1898); Finn v. United States, 123 U.S. 227 (1887); Nager Electric Co. v. United States, 177 Ct. Cl. 234, 249, 368 F. 2d 847, 857 (1966).
The petition in this case was filed August 27, 1968. Both properties at issue were taken by defendant prior to 1945 and have been occupied by it and by the Trust Territory Government continuously since that time. The As Perdido property has had an airfield on it in continuous use since prior to 1950, and the Garapan property has had a paved road and various buildings thereon, constructed by the Navy Department some time prior to 1951. Plaintiffs have been aware of such appropriation at all times and have made no effort to occupy either pi’operty since 1945.
Plaintiffs claim the statutory period did not begin to run until 1966, because they received no formal notice of determination from the Land and Claims Office until 1966, that they had no attorney before then, and were ignorant of their right to bring suit in this court; but such arguments are insufficient to avoid the bar of limitations.
First, if they did not receive fair or procedurally proper administrative treatment, their remedy was to appeal within one year from the administrative determinations to the Trial Division of the Trust Territory High Court, as provided in Trust Territory Office of Land Management Begulation No. 1, which had the power to hear the case de novo.[4] If there was proper basis for tolling the limitation provision on appeal, plaintiffs could have asserted such grounds in the Trial Division of the High Court and, if necessary, appealed therefrom to the Appellate Division of the High Court.[5] However, when plaintiffs’ 1966 suits against the district land title officer were dismissed without prejudice by the Trial Division, at a time when plaintiffs did have counsel, they discontinued any further proceedings in that court. This court *259 does not, of course, have appellate review jurisdiction over the High Court of the Trust Territory.
Second, assuming the claims to just compensation are cognizable under the United States Constitution and provide an independent basis for suit in this court, the administrative proceedings before the Trust Territory Government have not been made a prerequisite to such suit and hence do not toll the statute of limitations for bringing it. In creating the Court of Claims Congress restricted the court’s jurisdiction to suits wherein the petition is filed within 6 years after such claims first accrue. Soriano v. United States, 352 U.S. 270, 273 (1957). Where the filing of an administrative claim or other proceeding is not made a statutory prerequisite to suit but is only permissive, the statute of limitations is not tolled by the pendency of such a claim. Soriano v. United States, supra; Crown Coat Front Co. v. United States, 386 U.S. 503, 519 (1967); Friedman v. United States, 159 Ct. Cl. 1, 310 F. 2d 381 (1962), cert. denied, sub. nom. Lipp v. United States, 373 U.S. 932 (1963); Steel Improvement Co. v. United States, 174 Ct. Cl. 24, 355 F. 2d 627 (1966).
In Soriano v. United States, supra, plaintiff, a resident of the Philippines, brought suit in the Court of Claims to recover just compensation for the requisitioning by Philippine guerilla forces of food, equipment and supplies during the Japanese occupation of the Philippine Islands. The suit was filed in April 1951, more than 6 years after the last requisition in January 1945. The petitioner contended, however, that the suit was timely because he was first required to present his claim to the Army Claims Service and such administrative procedure was not exhausted until 1948. The Supreme Court ruled, however (352 U.S. at 274-75) :
Petitioner asserts that his action did not accrue until the denial of the claim by the Army Claims Service. * * * Petitioner would have us hold that this just compensation case could not be filed until after an administrative denial of his claim filed Avith the Army Claims Service. But * * * Congress has made no such requirement. It has not so restricted the jurisdiction of the Court of Claims.6 Under the circumstances, for us to say that the exhaustion of administrative remedies in such case is a prerequisite to the jurisdiction of the Court of *260 Claims would but “engraft [another] disability upon the statute” and thus frustrate the purpose of Congress. Furthermore, it would be a limitless extension of the period of limitation that Congress expressly provided for the prosecution of claims against the Government in the Court of Claims. This we cannot do. [Footnote omitted.]
Plaintiffs’ argument that they were ignorant of their rights and lacked legal counsel is also insufficient to toll the statute of limitations for suit in this court. A similar argument was considered in the case of Japanese War Notes Claimants Ass’n v. United States, 178 Ct. Cl. 630, 634-35, 373 F. 2d 356, 359, cert. denied, 389 U.S. 971 (1967). There the plaintiffs brought suit in 1964 to recover reimbursement for losses from counterfeit Japanese military currency distributed in the Philippine Islands by United States military intelligence agents during the Japanese occupation between 1942 and 1945. Plaintiffs claimed that they were ignorant of their rights and lacked knowledge of the circumstances during most of the intervening years. The court held however that, “Ignorance of rights which should be known is not enough” to toll the statute of limitations, and “Plaintiff must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was ‘inherently unknowable’ at the accrual date.” Congress has not provided for tolling the statute of limitations because a claimant has not had counsel. See Andrade and Pitt River Tribe v. United States, 202 Ct. Cl. 988, 997, 485 F. 2d 660, 664 (1973). To create such an exception would be to allow claims on behalf of one group of claimants to remain open indefinitely. This would tend to frustrate one of the prime objectives of the statute of limitations, “to prevent factual issues from being tried too long after the events occurred- — -with witnesses dead or gone, records lost or destroyed, and memories confused or dimmed — -at a time when the past cannot be reconstructed with any pretense of accuracy.” Friedman v. United States, supra, 159 Ct. Cl. at 34, 310 F. 2d at 401.
There is accordingly no need to resolve most of the other contentions and defenses raised by the parties concerning the administrative proceedings before the Trust Territory Gov- *261 eminent. However, with respect to the merits of the As Perdido property claim it must be observed that this issue having been fully tried before this court the evidence is persuasive that Joaquin Lizama had indeed sold the As Perdido property to the Japanese N.K.K. corporation in 1938, and therefore his heirs did not own such property at the time of its taking thereafter. As shown in greater detail in findings 16 and 19, this is borne out by photographic copies of the original records incident to the sale, containing Joaquin’s stamp or signature, which were found in N.K.K.’s files.
Plaintiffs claim in their brief that “[a] great deal(of doubt exists as to whether the purported sale of the farm at As Perdido was in fact a legal transaction.” A principal element of that contention is the evidence that Fritz Lizama, Joaquin’s son (also killed in the war), whose signature and stamp appear on the sales agreement as a witness to his father’s signature on the November 4, 1937 sales agreement, left Saipan in 1936 to go to Ponape and did not return until some time in the year 1938. But this is not sufficient to prove the entire sale was a fabrication. That would necessitate the conclusion that a number of other documents in Japanese and Chamorro were also fabricated: A survey map incident to the sales agreement; the joint application,by Joaquin and N.K.K., dated November 9,1937, for approval of the sale by the Director of the South Seas Bureau; the director’s approval, dated 'October 7, 1938; the letter, dated October 20, 1938, from the Saipan Branch Office of the South Seas Government transmitting such approval; and the joint letter from Joaquin and N.K.K. to the Saipan Branch Office, dated November 2, 1938, requesting registration of the transfer. This seems highly improbable. It is much more likely that the recollections of the witnesses as to when Fritz left Saipan or whether he returned for a visit are faulty after many years. It may also be, as plaintiffs’ counsel himself suggested at trial, that the agreement could have been sent to Fritz for execution in Ponape. And, still further, Fritz could have executed his attestation as a witness to his father’s signature upon his return to Saipan during the first half of 1938.
Plaintiffs also offered testimony that one Jose Cruz, a cousin of their father, continued to work on the farm during *262 1938. But in view of the fact that the transfer of the farm was not completed until November 1938, this evidence is not inconsistent with the fact of a sale.
Next, plaintiffs contend that the documents of conveyance “may or may not be authentic” because signature stamps could easily be made for 50 cents. But the documents were admitted in evidence without objection, and plaintiffs’ counsel conceded at trial that he had no direct evidence that the signatures and stamps were not that of Joaquin. Mere speculation that the execution might have been forged is not a-substitute for proof. Moreover, plaintiffs’ witness, Benigno O. Sabían, who testified as to the cost of the signature stamps, repudiated such speculation, stating that stamps had to be approved by government officials, that forgery could never happen and that the use of an unauthorized stamp would have resulted in imprisonment.
Finally, plaintiffs imply that the Japanese may have exercised coercion against Joaquin and they state that there is a question as to the adequacy of the compensation. But plaintiffs’ counsel conceded at trial that he had no evidence of coercion with respect to the 1938 transaction and he did not offer any testimony that the ¥3,224 (then worth about $806) was not a fair price for the land in 1938.
Thus even if their suit were not barred by the statute of limitations, the evidence adduced by the parties at trial shows that plaintiffs are not entitled to recover on the merits with respect to the major part thereof.
FINDINGS OF FACT
1. Plaintiffs are residents of Saipan, Mariana Islands and citizens of the Trust Territory of the Pacific Islands, of which the United States is trustee under a delegation from the United Nations.
2. Plaintiffs are the children and sole heirs of Joaquin Lizama, who was killed during the United States invasion of Saipan in 1944. They claim compensation for the taking by the United States of three tracts of land to which they became entitled by descent.
3. In their petition plaintiffs describe the property in question as follows:
*263 (a) Tlie land referred to in Trust Territory Determination of Ownership No. 265 as lot nos. 591, 592, 593, and 594, South District, located at Kobler Field, As Perdido, Saipan.
(b) The land referred to in Trust Territory Determination of Ownership No. 486, as lot no. 1387 in Garapan District, Saipan, containing one hectare.
(c) The land referred to in another Trust Territory Determination of Ownership as lot nos. 1359 and 1428 in Garapan District containing 6.0 hectares.
4. Plaintiffs offered no evidence of any kind and Have requested no findings with respect to the property enumerated in finding 3(c). Accordingly, it is concluded that plaintiffs have abandoned that claim.
5. Although the petition claims the property at As Per-dido (finding 3(a)) contained “12 hectares, more or less”, Determination of Ownership No. 265, to which the petition refers, describes the property as containing only “8.0 hectares, more or less, subject to survey,” and in their brief plaintiffs refer to the area as containing “from 8 to 12 hectares.” As finding 19, infra, reflects, it may only have comprised 6.8 hectares.
6. There is no dispute as to the taking of the two remaining tracts by the defendant. Both were taken prior to 1945 and retained continuously since then. The Navy Department designated the As Perdido tract as a military retention area and constructed an airfield, Kobler Field, and related buildings thereon at some time prior to 1950, and the Trust Territory Government has continued to use it for such purpose. The Navy Department during its administration of the Territory (prior to July 1951) constructed various buildings and a paved road on the Garapan property and thereafter designated it as a military retention area; and the Trust Territory Government has continued to use it for the same purposes. Plaintiffs have been aware of such actions since they occuri’ed and plaintiffs have not attempted to occupy either property since 1945.
7. Although the petition claims damages of $149,500' for the taking of such two properties based on claimed rental value for use since 1945, it is stipulated that in the event a compensable taking occurred in 1944 just compensation *264 measured by the aggregate fair market value of the two properties is $5,400 and that if a compensable taking occurred in 1966, as plaintiffs claim, the aggregate fair market value at that time was $10,000.
8. During the period between the two World Wars Saipan was governed by Japan, for most of such period under the authority of a mandate from the League of Nations. Under the Japanese administration the right of the native population to own private property was recognized and protected, at least as against private persons. Civil Administration Office 'Ordinance No. 3, promulgated January 20, 1916, partially amended in September 1931 by South Seas Bureau Ordinance No. 11, provided in part as follows:
ARTICLE I
Persons other than the Government authorities shall not conclude contracts looking to the purchase and sale, assignment or mortgage of land owned by natives.
This rule, however, is not applied in case sanction of the Director of the South Seas Bureau has been obtained. In this case unless a written application for registration of the contract is presented within thirty days after the sanction has been granted to the Branch Bureau governing the district, in which the land concerned is situated, the sanction becomes invalid. [Laws and Regulations, The South Sea Islands Under Japanese Mandate, Ch. VIII.]
9. After a 4-day bombardment United States Military Forces invaded Saipan on June 15,1944. Heavy fighting continued for about a month. At the time of the invasion there were about 3,500 Saipanese, 15,000 Japanese civilians and 30,000 Japanese soldiers on Saipan. When the fighting ended there were approximately 80,000 American troops on the island, only 900 Japanese troops remained alive, many Japanese civilians had been killed or committed suicide, and 400 local people had been killed. Almost all of the buildings and landmarks used for land surveys and cadastral maps had been destroyed. Most of what was left fell victim to the bulldozers of the military engineers, who covered the island with paved roads, airstrips, fuel and ammunition dumps, warehouses, pipelines, power lines, military quarters and military *265 braining areas for about 200,000 American troops preparing to invade Japan. Hardly a square foot of the island remained undisturbed.
The local people were put in protective custody in a fenced-in area where they remained until July 1946, a period of 2 years, except for work details under guard. All of the public land office records, including the survey maps, were lost during the fighting; and nearly all of the individual monuments which marked the corners of land parcels were missing. The American Military Government was able to piece together enough parts of Japanese cadastral maps of Saipan to cover the entire island. But while this located a land parcel with respect to adjoining parcels, it was not accurate enough to retrace prewar boundaries, lot and block numbers, or ownership. Thus when the local people regained their freedom and new maps were drawn, it became necessary for them to file claims to ownership of individual tracts, with very few having any documents to prove ownership.
10. United States Military Government was officially established on Saipan on June 19, 1944 when Proclamation No. 1 was posted in the area occupied by the United States Armed Forces. Proclamation No. 1 assured the people that “property rights will be respected and existing laws will remain in force and effect” except insofar as specifically changed.
11. In 1947 the United Nations agreed to a trusteeship for the former Japanese mandated Pacific Islands with the United States as the administering authority. Military government on Saipan ended on July 18, 1947, when the Joint Resolution of the United States- Congress approving the trusteeship went into effect. By Executive Order 9875 of July 18, 1947, 3 C.F.E. 1943-1948 comp., at 658, responsibility for civil administration of the Trust Territory was initially delegated to the Secretary of the Navy on an interim basis, who on the same day delegated it to a High Commissioner. (Trust Territory Code, at xviii-xxi (1952 ed.).)
12. On December 29,1947, the Deputy High Commissioner, Trust Territory of the Pacific Islands, issued Trust Territory Policy Letter, P-1, prescribing land policy to be followed in the administration of the Trust Territory, including *266 Saipan, and setting guidelines with respect to the determination of the validity of prewar land transfers. It stated in part:
5. The guiding principle of land policy is to safeguard native land rights and land ownership; and so far as possible, to provide each family with land sufficient for adequate subsistence, and to assure community-wide access to essential land resources.
The letter further stated:
VALIDITY OF LAND TRANSFERS MADE IN THE PAST
10. Decisions by former governments as to land ownership and rights, prior to the effective date of Japan’s resignation from the League of Nations, on March 27, 1985, will be considered binding.
11. Rights in lands acquired by the German or Japanese governments will be deemed to be property belonging to the Government of the Trust Territory.
*****
13. Land transfers from non-Japanese private owner to the Japanese government, Japanese corporations, or Japanese nationals since March 27, 1935, will be subject to review. Such transfers will be considered valid unless the former owner (or heirs) establishes that the sale was not made of free will and that just compensation was not received. In such cases, title will be returned to former owner upon his paying into the Trust Territory government the amount received by him. Yen currency and Japanese postal savings which have been turned in by the former property owner (or heirs) to United States authorities for redemption, and which have not been exchanged for dollars, may be credited toward the payment required to clear the title. In case sufficient yen are not available from this source, exchange will be computed at the following rates, for transactions during the times indicated: prior to 1940,4 yen to the dollar; 1940, 5 to 1; 1941, 6 to 1; 1942, 7 to 1; 1943, 8 to 1; 1944, 9 to 1; 1945, 10 to 1.
LAND REQUIRED BY GOVERNMENT ACTIVITIES
14. Public interest during the war and the immediate post war period required seizure of private property, and in some cases the construction of military and government establishments thereon. Occupation of private property without compensation to lawful owners still continues in some localities. This condition must be *267 rectified as soon as possible, for it is the policy of the United States that the owner or owners of private property required for public use shall be properly compensated for the loss of property taken.
# # % sjs
17. When it is necessary to retain privately owned land for government purposes, it is preferable from all points of view that the owner or owners, including those holding remainder or reversionary rights, be compensated by award of title to other land, rather than by cash payment. Government owned land, including public domain, may be used for this purpose, after determination of the extent of the government interest and of any private interests remaining therein, if an agreement fair to the former owner and to the government can be reached. When such an agreement camiot be effected, cash compensation from date of seizure is in order. * * *
13. Trust Territory Office of Land Management Regulation No. 1, originally issued January 11, 1951, provided for the filing of a claim by every person claiming an interest in land used or occupied by the United States. A title officer was authorized in each district to determine, after due notice and hearing in accordance with the regulation, the ownership of any tract of land in the district which was used, occupied or controlled by the Government, and to appraise, evaluate and recommend for settlement any claim for damage, rent or alienation resulting from such use or occupation. Notice of all hearings was to be posted publicly and to be given to all parties of record. With respect to an estate claimed jointly or in common by the heirs of a deceased owner, Avhere no executor or administrator had been appointed, the regulation provided in pertinent part:
Sec. 9. Estates of deceased persons; estates claimed jointly or in common; other group-owned estates; representation by land trustees.
(a) Where an estate is determined to be claimed jointly or in common by the heirs of a deceased owner, or by any other group or association of individuals, the District Land Title Officer may appoint one or more persons to act as trustee or trustees for the group, and such person or persons shall have full authority to act for all members of the group in all matters connected with land return and claims for the use, retention, or occupation of the *268 land. Sucb trustees shall be known as “Land Trustees,” and shall be appointed only where no administrator or executor has been appointed for an estate, or no other responsible person or reasonably small group of persons is authorized to act for a group or association. The Land Trustee, shall act as administrator of lands of deceased persons, and shall take immediate steps to determine the persons interested in the land as heirs or otherwise, and to have the land distributed according to law or the desires of the true owners, subject to approval of the courts in the event of controversy. * * * A Land Trustee may not sell or otherwise dispose of the land or any interest therein, except a lease not exceeding one year, except with the approval of all parties having an interest in the land or of the Trial Division of the High Court.
Review of the title determination was provided as follows:
Sec. 14. Appeal. Any person who has or claims an interest in the land concerned may appeal from a District Land Title Officer’s determination of ownership to the Trial Division of the High Court at any time within one year from the date that the determination is filed in the office of the Clerk of Courts. The Trial Division of the High Court may set aside, modify, or amend the determination of the District Land Title Officer. Hearings on appeal may be de novo or on the record at the discretion of the court.
14. By Executive Order 10265 dated June 29, 1951, 3 C.F.R. 1949-1953 comp., at 766, effective July 1, 1951, administration of the Trust Territory was transferred from the Secretary of the Navy to the Secretary of the Interior. In the exercise of such authority, by Department of Interior Order No. 2658, dated August 29, 1951, the Secretary provided that the interim regulations of the Trust Territory in effect on July 1,1951, were to remain in effect until changed and he vested the “executive” authority of the Government of the Trust Territory in the High Commissioner. On June 29, 1953 the High Commissioner substantially readopted Office of Land Management Regulation No. 1.
15. The original claims with respect to both tracts of land at issue were filed by Carmen M. Lizama, widow of Joaquin Lizama. Claim 59-A, filed January 4, 1945, covered the As Perdido property (lot nos. 591-594) and stated that the area was about 8 cho. (A cho is a Japanese area measure *269 equivalent to slightly less than one hectare.) Claim 75-A, filed January 10, 1945, covered the Garapan land (lot no. 1387) having an area of about one cho.
16. After Carmen’s death in November 1946, however, on some date between 1950 and 1952 plaintiff Veronica Lizama Camacho, daughter of Joaquin and Carmen, executed the following “statement as to land ownership claim #59-A”:
My mother, Carmen M. Lizama, made a claim to lot #592, South District prior to her death. She did this not knowing that it had already been sold by her hus band to the N.K.K. Company. I wish to certify that lot #592, South District, rightfully belongs to the Japanese Company and not the heirs of Carmen M. Lizama.
Veronica attempted to repudiate this statement at trial, claiming she had only signed a blank piece of paper, and that she did not understand English. However, there were two witnesses to her execution of the documént, Judge Gregorio T. Camacho and Henry S. Pangelinan, an official of the Land and Claims Office. Their testimony establishes that Veronica executed the document in the Land and Claims Office, that the document was typewritten before she signed it, that she engaged in a half-hour’s discussion with a local Land and Claims Office official in the Chamorro language before she executed the document.
17. In Determination of Ownership No. 265, filed (as amended) December 29, 1952, John A. Wood, Title Officer, Saipan District, stated that “after due public notice and private notice to all parties as of record, and after public hearings at which all persons claiming an interest in [lots number 591, 592, 593 and 594] were given full opportunity to be heard” he had determined that the land had been “the property of the government of the Japanese mandated territory and is now vested in the Area Property Custodian for the Trust Territory of the Pacific Islands pursuant to the vesting order dated September 27, 1951”, and he released the land and gave immediate possession to such custodian.
18. Plaintiffs filed no appeal from such determination of the Title Officer to the High Court within one year as permitted by Regulation No. 1.
*270 19. That the As Perdido land's for which plaintiffs claim compensation from tlie United States bad been sold by Joaquin Lizama in 1938 is borne out by copies of the original records of the conveyances now in the custody of the Lands and Surveys Division of the Trust Territory Government at Saipan. Although, as already found, the land surveys and cadastral maps of Saipan were destroyed during the invasion of Saipan in 1944, the records of Nanyo Kohotsu Kabushiki Kaisha (N.K.K.), a large Japanese corporation engaged in farming operations on the island escaped destruction and were found in its Saipan offices.
The complete records show that Joaquin Lizama, who resided at Chalan Nuevo, Garapan, Saipan, had leased the As Perdido tract in two segments in 1933 and 1937; the first segment to a Japanese farmer, Yugaku Yogi, for the period 1933 to 1944, and to N.K.K. from 1944 to 1957; the other segment to N.K.K. from 1937 to 1957. On November 4,1937 he entered into an agreement to sell the entire farm to N.K.K. for T3,224.60, delivery to be made on the day registration was completed subsequent to the grant of approval of the sale by the Director of the South Sea Islands Government. The agreement was accompanied by a survey map showing the entire area of the farm, which was found to consist of 6.87 cho (68,210 square meters). The parties’ joint application to the Director of the South Sea Islands Government for approval of the sale was dated November 9, 1937. By letter dated October 20,1938 the Saipan Branch Office of the South Sea Island Government transmitted a copy of approval of the sale by the Director, dated October 7, 1938, and on November 2, 1938 the parties applied for registration of the sales agreement with the Saipan Branch Office of the South Sea Island Government and reported delivery of the deed. All of the documents purporting to be executed by Joaquin Lizama show his seal or stamp, which was required by Japanese law.
20. In Determination of Ownership No. 486, filed July 16, 1953, Title Officer 'Wood stated that “after due public notice and private notice to all parties as of record, and after public hearings at which all persons claiming an interest in *271 [lot no. 1387, Garapan District] were given full opportunity to be heard”, he had determined that that tract, consisting of one hectare, was “the property of the heirs of Joaquin Lizama represented by Jose M. Lizama as land trustee,” but that possession was denied to them because the land was part of the United States retention area.
21. On December 30, 1954 Jose M. Lizama, representing the heirs of Joaquin Lizama, deceased, as land trustee, pursuant to Title Determination No. 486, entered into a written agreement with the Trust Territory Government for the exchange of lot no. 1387 for other property.
22. Plaintiffs refused to accept deeds tendered to them by the Trust Territory Government on February 5,1958, as the heirs of Joaquin Lizama, deceased, represented by Jose M. Lizama, as land trustee, pursuant to the written exchange agreement, and they refused to execute a quitclaim deed for lot no. 1387. Jose’s explanation for such refusal was that he had originally been shown and told that he was to receive a larger tract than that which was later set forth in the written agreement, which he did not understand because it was in English and not translated to him, and that each of the other heirs did not receive the house lot he or she was to receive under Jose’s oral understanding with the Office of Land and Claims. Defendant did not offer any testimony to rebut Jose.
23. Both the land title officer and the other plaintiffs authorized Jose Lizama to act as land trustee in the presentation of the plaintiffs’ claim with respect to lot no. 1387, but there is no evidence that they specifically authorized or ratified the exchange agreement.
24. As a matter of general procedure notices were posted at appropriate places throughout the island inviting the filing of land claims. After claims were filed they were investigated by or on behalf of the land title officer, and the records of the German and Japanese administrations were examined to the extent they were available. All interested parties were given the opportunity by notices to be present in the land and Claims Office and present their cases. Owners of the land and neighbors were called in and questioned *272 under oatli as to land ownership. Opportunity was given to the claimant to find out who the witnesses were against him and to cross-question them. Although the record does show that Jose and Veronica were questioned and signed statements concerning the As Perdido property, the record does not indicate that any formal hearings were held in determining the ownership of such property. Several of the plaintiffs testified they received no notice of any hearing. It is also reasonable to infer that some of the plaintiffs did not receive notice of the two determinations at issue. But both determinations designated those receiving copies as including the “owner.” It is not reasonable to conclude that Jose Lizama, the oldest son, who, following Chamorro custom, was designated to act on behalf of the other heirs in presenting claims did not receive notice of the determinations and did not communicate them to the others. And it is not reasonable to conclude that in all the years between 1945 and 1966 the plaintiffs did not know of the two determinations and made no inquiry concerning the disposition of the lands for which first their mother and then Jose had made claims on their behalf.
25. On June 29, 1966, plaintiffs brought ¡a suit in the Trial Division of the High Court of the Trust Territory, Mariana Islands District, entitled, Jose M. Lizama, et al., Plaintiffs, v. Elias P. Sablan, District Land Title Officer, Defendant, Civil Action No. 174, invoking the original jurisdiction of such court to try all causes involving the adjudication of title to land. The complaint averred plaintiffs owned approximately 12 hectares of land at or near As Perdido, Saipan, that they had unsuccessfully claimed it in 1954, and they requested compensation and return thereof. The defendant moved to dismiss with prejudice because: (1) the court lacked jurisdiction of the suit, no appeal having been taken from Title Determination No. 265; (2) plaintiffs had failed to join an indispensable party, the Government of the Trust territory, which had not consented to be made a defendant; (3) an appeal from the Determination was barred by the one-year limitation period; (4) the complaint lacked certainty in that it failed to describe the land; and (5) if the *273 property was the same as that in the Determination, plaintiff, as trustee for all the heirs, was estopped by his sister Veronica’s acknowledgment on February 11,1952, that their father had sold the land to the Japanese in 1938. After oral argument, on October 31, 1966, the court entered an order dismissing the suit without prejudice and without opinion. Plaintiffs filed no appeal to the Appel] ate Division of the High Court.
26. On June 29, 1966, more than 7 years after the tender, plaintiffs brought suit in the Trial Division of the High Court for the Trust Territory, Mariana Islands District, entitled, Jose M. Lizama, et al., Plaintiffs, v. Elias P. Sablan, District Land Title Officer, Defendant, Civil Action No. 175, invoking the original jurisdiction of such court to try all causes involving the adjudication of title to land. The complaint averred that plaintiffs owned approximately one hectare of land in Garapan Village, Saipan, that they had made a claim for this land in 1954 without success, and they requested compensation and return of the land. The defendant moved to dismiss with prejudice because: (1) the court lacked jurisdiction of the subject matter; (2) plaintiffs had failed to join an indispensable party; (3) the complaint showed on its face it was barred by limitations; (4) the complaint failed to state a claim upon which relief could be granted; and (5) the plaintiffs were estopped. In a memorandum in support of these contentions the attorney for the defendant also pointed out specifically that assuming the complaint dealt with lot no. 1387, plaintiffs had agreed to exchange the land for other land. After oral argument, on October 31, 1966, the court entered an order dismissing the suit without prejudice and without opinion. Plaintiffs filed no appeal to the Appellate Division of the High Court.
CONCLUSION OK LAW
Upon the foregoing findings of fact and opinion, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover and their petition is, therefore, dismissed.

 One hectare equals 10,000 square meters or approximately 2.43 acres.

 Now Allen Property Custodian. 27 Trust Territory Code 5 2 (1970).

 Cf. Juragua, Iron Co. v. United States, 212 U.S. 297, 306 (1909) ; United States v. Caltex, Inc., 344 U.S. 149 (1952) ; Pauly v United States, 152 Ct. Cl. 838 (1961) ; Aris Gloves, Inc. v. United States, 190 Ct. Cl. 367, 420 F. 2d 1386 (1970) ; Seery v. United States, supra; and Cuban Trucle and Equipment Co. v. United States, 166 Ct. Cl. 381, 333 F. 2d 873 (1964), cert. denied, 382 U.S. 844 (1965).

 Cf. 67 Trust Territory Code § 115 (1970) (1966 ed., § 1039). And see Rivera v. Trust Territory, 4 Trust Territory Reports 140 (1968), which outlines the relief available In the High Court In cases presenting such Issues, and Sechelong v. Trust Territory, 2 T.T.R. 526 (1964).

 Ibid. And see Ngodrii v. Trust Territory, 2 T.T.R. 142 (1960) for a case In which the limitations provision in Office of Land Management Regulation No. 1 was tolled.