Gregorio P. CASTRO

v.

The UNITED STATES.*

No. 310–68.

United States Court of Claims.

Oct. 23, 1974.

William B. Nabors, Saipan, Mariana Islands, attorney of record, for plaintiff.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen., Wallace H. Johnson, for defendant.

Before COWEN, Chief Judge, and NICHOLS, Judge.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's motion, filed May 24, 1974, moving that the court adopt, as the basis for its judgment in this case, the recommended decision of Trial Judge Philip R. Miller, filed February 20, 1974, pursuant to Rule 134(h), defend-

* Editor's Note: The decision in Saul Bass & Associates v. U. S., published in the advance sheets at this citation (500 F.2d 436) was withdrawn from the bound volume and will be republished.

ant having failed to file a notice of intention to except thereto and the time for so filing pursuant to the Rules of the court having expired. Upon consideration thereof, without oral argument, since the court agrees with the decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is entitled to recover and judgment is entered for plaintiff in the sum of $1,100 plus an additional sum computed thereon at the rate of 4 percent per annum from September 1, 1957, to date of payment, as a part of just compensation.

## OPINION OF TRIAL JUDGE

MILLER, Trial Judge: This is another suit for just compensation under the fifth amendment to the Constitution for the taking by the United States of land in Saipan, Mariana Islands.[1] The taking here too is an outgrowth of events originating in World War II and continuing thereafter. The claim is with respect to land originally owned by Vincente D. de Castro, a native of Saipan, who died in 1946. The plaintiff, Gregorio P. Castro, is the decedent's son and heir, and a citizen of the Trust Territory of the Pacific Islands.

Plaintiff claims compensation for defendant's destruction of 800 coconut trees on property which he asserts consists of 5 hectares of land, described generally as lots 297, 299, 302 and 330, and for the loss of use and occupation of such land from 1944 to 1968.

From about 1914 to 1944 Saipan was under Japanese rule. It was invaded by the military forces of the United States on June 15, 1944 after a heavy 4-day bombardment. Organized resistance by the Japanese continued until July 9, 1944, when the island was declared "secure." United States Military Government was established on Saipan on June 19, 1944. From the inception, by proclamation the United States gave public assurance that "property rights will be respected and existing laws will remain in force and effect," although the local people were put in protective custody in a fenced-in area for a 2-year period ending in July 1946. United States Military Forces occupied practically the entire island, stationing thereon up to 200,000 troops together with airstrips, fuel and ammunition dumps, warehouses, training areas and other related facilities, in preparation for the invasion of Japan.

As a result of the heavy fighting during and after the original landing and the reconstruction of the land areas to accommodate military needs, most public land office records including survey maps were lost, and nearly all of the individual monuments marking the corners of land parcels were displaced. Thus when the local people regained their freedom and new maps were drawn, it became necessary for them to file and prove claims to ownership of individual tracts. In December 1947 the Government of the Trust Territory of the Pacific Islands, administering Saipan under a delegation to the United States from the United Nations, reaffirmed "the guiding principle of land policy * * * to safeguard native land rights and land ownership" so far as possible so as to provide each family with land sufficient for adequate subsistence and assure community-wide access to land resources. It also stated "the policy of the United States that the owner or owners of private property required for public use shall be properly compensated for the loss of property taken." Where it was necessary to retain privately owned land for Government purposes, it was deemed preferable to compensate the owner by exchanging other public land for the property taken, but otherwise to pay cash compensation from the date of seizure. Rental at reasonable rates was also to be paid for temporary takings.

A land title office was set up to determine the validity of private claims to publicly occupied property, with an appeal from such determination available

---

1. *See* Camacho v. United States, 495 F.2d 1363, 204 Ct.Cl. 248 (1974).

to the High Court of the Trust Territory.

After the end of World War II the United States Military Forces continued to occupy large portions of the island. However, it was not until about 1950 that the Department of Defense decided which areas of Saipan it wished to retain for military purposes. At that time it decided to keep approximately 5,000 hectares, of which 400 were in 137 separate privately owned tracts. Its program for acquisition contemplated offering to owners of such tracts exchanges of equivalent values in Trust Territory public land. In the exchanges the Trust Territory Government became the owner of the formerly private land and leased it to the Department of Defense, with the understanding that the latter would review its needs every 5 years and release unneeded land to the Trust Territory Government. In return the United States paid the Trust Territory Government at the rate of $40 per acre of retained land. (1 acre equals about 0.4 hectares.) The exchange program got under way in 1953, and eventually 723 hectares of public land were given for the 400 hectares of private land.

Prior to termination of Japanese rule plaintiff's father, Vincente D. de Castro, owned at least 16 hectares of land in the Marpi area of Saipan, of which approximately 5 hectares were leased to a Japanese citizen named Kudaku Taru for 30 years beginning in 1924, with the rent having been received in advance. United States Military Forces occupied all 16 hectares of such land shortly after the invasion began in June 1944. It destroyed many coconut trees during the invasion, including the 800 which had been located on the land at issue.

As early as December 1944 Vincente D. de Castro, plaintiff's predecessor, executed claim no. 129 asserting ownership of the 16 hectares of land and presented it to the military government. After Vincente's death in 1946, no action having been taken on that claim, on February 21, 1948, Gregorio P. Castro, the plaintiff, executed a second declaration of land ownership for the same 16 hectares under claim no. 129 on behalf of the heirs of Vincente.

Prior to hearing on plaintiff's claim, during 1951 the Area Property Custodian of the Trust Territory (later Alien Property Custodian) vested title to the portion purportedly leased to Kudaku Taru and other portions on the ground that they were owned by Japanese nationals. However, Gregorio P. Castro then being employed away from Saipan on a ship, on September 16, 1953, Sister Remedios de Castro, as representative of the heirs of Vincente, executed and filed a statement in further support of claim no. 129 reaffirming that all of the property had been owned by her late father Vincente and not Japanese nationals. After a hearing, at which the heirs of Vincente were represented by Sister Remedios de Castro, in November 1953 the land title officer for the Saipan district issued determinations of ownership with respect to claim no. 129. He determined first that part of lot 305 and all of lot 317, which had in form been leased to Kudaku Taru for a 30-year term with compensation paid in advance and which consisted of approximately 5 hectares, was property owned by a Japanese national and therefore properly vested in the Area Property Custodian. He also determined that lots 303, 304, 314, 326, and the remainder of lot 305, consisting of about 11 hectares, were owned by the heirs of Vincente D. de Castro, but that they were not entitled to possession because it was "part of a U.S. Retention Area." He made no determination with respect to lots 299, 302, and 330, also encompassed by claim no. 129. Following these determinations, plaintiff and his sister executed agreements and subsequently quitclaim deeds conveying lots 303, 304, 314, 326, and part of 305 to the Government of the Trust Territory, in return for which the latter transferred to the heirs of Vincente other lots from the public domain. In exchange for the 11 hectares the heirs received 33 hectares of public land.

Although in 1953 the United States did not seek to retain for military pur-

poses the remaining lots in claim no. 129, it nevertheless excluded plaintiff from occupying or using such property until 1968. It stockpiled large quantities of ammunition in the Marpi area, where plaintiff's lots were located, until 1949. Thereafter it initiated a program of controlled destruction of such unneeded ammunition, but an accidental explosion scattered large amounts of live projectiles, shells and grenades throughout the Marpi area, with the result that defendant found it necessary to bar civilian use or occupation of the region as hazardous for years thereafter. In 1951 the Department of Defense stationed in the Marpi area a military organization known as the Naval Technical Training Unit (NTTU). Although the nature of its operations is not disclosed by the record, NTTU continued to exclude civilian owners and it remained in possession until 1962. After NTTU left, the Marpi area remained closed to the local population, except by pass or permit, because of the continuing dangerous conditions caused by the unexploded ammunition left in the ground. It was not until September 20, 1968, that the land was declared cleared of live explosives and unrestricted use and occupancy of the property was permitted.

In December 1965 plaintiff and his sister brought suit in the Trial Division of the High Court for the Trust Territory seeking distribution of the estate of their father, Vincente. Plaintiff claimed that his father had owned approximately 16 hectares of land; that the land title officer had improperly determined that his father had disposed of 5 of the 16 hectares; and that the exchange of 11 hectares should be set aside as involuntary and unauthorized. The land title officer appeared by a Deputy Attorney General for the Trust Territory to object to the petition on the ground that the lands in question were not owned by the heirs of Vincente D. de Castro, because some of the lots had been sold to Japanese interests before the war and had been vested by the Area Property Custodian; that those lots which had not been vested were owned by the Trust Territory Government pursuant to the 1955–56 agreements and exchanges; and that to the extent there remained lots not covered expressly by the 1953 title determinations, such determinations by implication had found that the heirs of Vincente D. de Castro did not own those lots.

Although the distribution action would normally have been one exclusively between the heirs, the intervention by the land title officer to object that the lands were not owned by the heirs caused the court to rule that the action "involve[d] first a determination of whether the heirs or any of them were owners." In a preliminary judgment entered March 27, 1968, it held, first, that the parties were bound by the land title officer's prior determinations that the approximately 5 hectares were vested in the Area Property Custodian and that plaintiff owned but had no right to possession of the approximately 11 hectares retained by the Government for military purposes. It also held that in 1955 and 1956 plaintiff had voluntarily exchanged the 11 hectares for 33 hectares of public lands and that all other heirs acquiesced in the exchange. Accordingly it dismissed the petition with respect to all lots and house sites mentioned in the determinations and transfers. However, it held, there had been no determinations of ownership with respect to four remaining lots covered by the petition, numbered 297, 299, 302, and 330, and it reserved jurisdiction to adjudicate the petitioner's claim for distribution of such lots in a subsequent trial. Neither the petitioner nor the land title officer appealed this decision to the Appellate Division of the High Court.

The question as to ownership of the four remaining lots was tried by the High Court in May 1968. A new Trust Territory Attorney General declined to take any further action in the suit on behalf of the land title officer and presented no evidence at this trial with respect to the four lots. By judgment order dated May 17, 1968 the Court then

held that, "As between the parties and all persons claiming under them, including all heirs of Vincente D. de Castro, the land known as lots 297, 299, 302 and 330 * * * are owned by the petitioner Gregorio P. Castro" free and clear of the claims of any other heirs; that absent any appeal, "this judgment shall operate to transfer to said Gregorio P. Castro, as his individual property, all right, title and interest which said Vincente D. de Castro had in said lands at the time of his death"; and that "the Land Title Officer * * * is requested to note this judgment in his records." No appeal was taken by anyone from such judgment and the time has expired for any such appeal.

Defendant makes two major defenses to the plaintiff's claims for just compensation. First, the action is barred by the statute of limitations, 28 U.S.C. § 2501, because the claim first accrued more than 6 years before the filing of the petition in this court on October 14, 1968. Second, plaintiff is not entitled to compensation for the destruction of the 800 coconut trees because they were destroyed during the invasion of Saipan by the United States Forces.

■ The second defense, although only partial, is clearly correct. The evidence confirms that the destruction of the coconut trees took place during the invasion of Saipan, and indeed plaintiff states that he agrees with defendant's requested finding to that effect. It is well-established that destruction or loss of property in the course of wartime military operations or as an incident thereto does not give the owner a right to compensation under the fifth amendment. Thus, in United States v. Caltex, Inc., 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (1952), oil companies were denied compensation for the Army's demolition of their petroleum stocks, oil terminals, storage facilities and warehouses in Manila, Philippine Islands, in December 1941, to preclude their takeover by the Japanese. In Juragua Iron Co. v. United States, 212 U.S. 297, 29 S.Ct. 385, 53 L.Ed. 520 (1909), recovery was denied

to the U.S. owners of 66 factory and employees' residential buildings which had been destroyed by American soldiers in the field in Cuba because it had been thought necessary to prevent the spread of yellow fever which might endanger the health of the troops. In Aris Gloves, Inc. v. United States, 420 F.2d 1386, 1391–1392, 190 Ct.Cl. 367, 375–377 (1970), an American corporation owning glove manufacturing plants liberated by the U. S. Army in East Germany, was denied compensation for the Government having turned the plants over to the Russians for dismantling and removal as a part of an agreement for the division of German territory in August 1945, on the ground that "The war power continues past the end of hostilities and into that period during which the evils which gave rise to the hostilities are sought to be remedied." And *see also* American Manufacturers Mutual Insurance Co. v. United States, 453 F.2d 1380, 197 Ct.Cl. 99 (1972), and Franco-Italian Packing Co. v. United States, 128 F. Supp. 408, 130 Ct.Cl. 736 (1955).

■■ Defendant's statute of limitations defense with respect to the remainder of the claim is not equally meritorious. It is true that under 28 U.S.C. § 2501 the petition must be filed within 6 years of the time the claim first accrued. However, when a taking occurs over a period of time, the owner is entitled to wait until the full extent or duration of the taking becomes clear before the time for bringing suit for just compensation commences to run against him. As the Court stated in United States v. Dickinson, 331 U.S. 745, 749, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1947), "[W]hen the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken'." In *Dickinson* the Government built à dam which raised the level of the river behind it in successive stages over more than a 2-year period. The Court held

that the limitations period on suit for compensation by one whose land was flooded did not start to run until the water reached its ultimate level. Since the taking was not by a single event, even if he could bring suit at an earlier stage the law did not bar the owner from waiting "until the consequences of inundation have so manifested themselves that a final account may be struck." (331 U.S. at 749, 67 S.Ct. at 1385.)

The *Dickinson* rule has been applied by this court in other situations. In Silverberg v. United States, 155 Ct.Cl. 436 (1961), slaughterers brought suit June 1, 1951 for additional compensation for meat they were required to set aside and deliver to the armed services at wholesale prices, rather than in their own stores at higher retail prices, from 1943 to 1946. The court denied the Government's motion to bar recovery for any deliveries prior to June 1, 1945, because if there was a taking it was by a continuous process. Until the set-aside order was terminated in October 1946 the plaintiffs had no way of determining how much meat would be requisitioned. No final account could be struck until the date of the last delivery, and it was unreasonable to require plaintiffs to bring multiple suits. Hence, the court held, plaintiffs were entitled to defer action until they knew how much of their property would be taken pursuant to the set-aside order and then bring one suit for all of it. In Oro Fino Consolidated Mines, Inc. v. United States, 92 F.Supp. 1016, 118 Ct.Cl. 18 (1950), cert. denied, 341 U.S. 948, 71 S.Ct. 1015, 95 L.Ed. 1371 (1951), a suit filed in 1950, seeking just compensation for losses incurred from 1943 to 1945 as a result of a 1942 Government order prohibiting the mining of gold during the war, was held not to have been brought too late for recovery of 1943 and 1944 losses. The court reasoned that the order was a temporary measure and until it was revoked in 1945 no one could know exactly what was taken. The same rule has been applied in cases involving avigation easement where the impairment of land use by overflights was progressive and

its frequency and seriousness were not fully ascertainable until a period of years had elapsed. Avery v. United States, 330 F.2d 640, 165 Ct.Cl. 357, (1964); Aaron v. United States, 311 F. 2d 798, 160 Ct.Cl. 295 (1963) and 340 F.2d 655, 167 Ct.Cl. 818 (1964), and Klein v. United States, 152 Ct.Cl. 221 (1961), cert. denied, 366 U.S. 936, 81 S. Ct. 1661, 6 L.Ed.2d 847 (1961). And *see also* Terteling v. United States, 334 F.2d 250, 167 Ct.Cl. 331 (1964), involving a claim for damages arising from a continuing breach of contract.

The facts here also reflect a taking of uncertain extent and duration. The four lots at issue were initially occupied by the United States as a part of its wartime invasion and occupation of the entire island. The initial proclamation of the invading force in 1944 stated that private property rights would be respected. In 1947 the stated policy of the United States and Trust Territory Governments was to safeguard native land rights and land ownership, to return land not needed for military or other governmental purposes and to pay compensation for land taken or rent for land occupied by governmental authorities. After the war the local people were encouraged to file land claims for return of their property, and unless the United States designated a particular tract as necessary for retention by it for military purposes, it was to be returned to the claimant. By 1950 the Department of Defense had decided to so designate only 400 hectares of privately-owned property. In 1953 when plaintiff's claims to the entire 16 hectares were up for determination of ownership, the United States designated some of the lots as military retention areas but did not include the four lots at issue. While defendant continued to exclude the owners of lots in the Marpi region from occupancy, first because of the ammunition dumps in the area, then because of the stationing of the NTTU in the area, and finally because of the hazards attributable to live explosives buried in the soil, there was never a designation of the four lots for permanent

military retention, and plaintiff had no way of knowing the duration of its exclusion from occupancy. When in 1968 the owners of Marpi region lands were permitted to return to their property, it was finally possible to compute the extent and duration of the taking. It was then that a final account could be stated. Under the rule set out by the Supreme Court in *Dickinson* plaintiff was not obligated to bring multiple piece-meal suits to compensate him for the loss of occupancy prior to 1968. He could wait until the property was returned to him by defendant in 1968 before he brought suit in this court.

██ Defendant raises another partial defense that neither plaintiff nor his predecessor owns or owned lot 297. The evidence shows that plaintiff never claimed title to lot 297 either in the claim filed with the land title officer or in the petition for distribution of the property in Civil Action No. 158. Defendant asserts that the High Court decision adjudicating his title to lot 297 among the four lots was an error by the Court in copying figures.

The pretrial order and the two judgments of the High Court reflect confusion in the numbering system for the various lots. Apparently there were two overlapping numbering systems on the maps. The pretrial order shows that the land title officer who objected to plaintiff's claims of title asserted that eight of the lot numbers in the petition were numbers for farm-house sites included in other lots. Among these, he stated, lote 299 was a farm-house site on lot 297. In its preliminary judgment order of March 27, 1968, dismissing the action with respect to lots owned by or transferred to the Government by plaintiff, the court listed both lot numbers and farm-house site numbers included therein without differentiation. Apparently the judgment order gave similar treatment with respect to lots and house sites not dismissed. It appears that the High Court reached its decision that plaintiff owned lot 297 as a concomitant of its decision with respect to house site 299. Since the record in that action was

not available and defendant offered no evidence that the court had inadvertently erred in the figures, there is no basis for any contrary inference.

The Trust Territory Code (1970) provides:

Title 5 § 53. Original jurisdiction of Trial Division. The Trial Division of the High Court shall have original jurisdiction to try all causes, civil and criminal, including probate, admiralty, and maritime matters and the adjudication of title to land or any interest therein.

\*　　\*　　\*　　\*　　\*　　\*

Title 8 § 2. Judgments affecting land. A judgment adjudicating an interest in land shall, after the time for appeal therefrom has expired without notice of appeal being filed \* \* \* operate to release or transfer any interest in land in accordance with the terms of the judgment, when a copy thereof, certified by the Clerk of Courts, or any judge of the court, is recorded in the office of the Clerk of Courts for the district in which the land lies.

Since no appeal to the Appellate Division of the High Court was filed by the land title officer, such judgment is now final.

In adjudicating the liability of the United States for compensation for the taking of property this court is not bound by the decision of a local trial court as to ownership of the property which was not appealed by any party. *See* Commissioner v. Bosch, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); Julian J. Studley, Inc. v. Gulf Oil Corp., 425 F.2d 947 (2d Cir. 1969). However, in the peculiar circumstances of this case, where proof of title to property must rely on local administrative and judicial determinations because other records are not available, and because defendant has offered no contrary testimony and there is no other claimant to compensation for the occupancy by defendant, the decision of the Trial Division of the High Court is evidence of ownership which should not be disregarded. *See* Commissioner v. Bosch, *su-*

*pra,* 387 U.S. at 465, 87 S.Ct. 1776; Paoletto v. Beech Aircraft Corp., 464 F.2d 976, 979, n. 4. (3d Cir. 1972).

Finally, whether the designation lot 297 covers a lot or a house lot, or is a misdesignation for some other lot, the stipulation of the parties that the reasonable value of the use and occupancy of all four lots by the United States was $50 per year would seem to be binding in any event.[2]

■ Accordingly, solely for purposes of the issues in this case, absent other proof in the record it is concluded that a reasonable time for the termination of defendant's wartime and necessary post-war occupancy of plaintiff's land as a part of its military operations was September 1946. Defendant is therefore liable to plaintiff for the taking of use and occupancy of the four lots at issue for a period of 22 years at the rate of $50 per year, or an aggregate of $1,100. Plaintiff is also entitled to an additional sum computed at 4 percent per annum, to compensate for delay in payment, as part of just compensation. For the sake of convenience such additional sum (commonly called interest) is to run from approximately the midpoint of the period of taking, *i. e.,* September 1957, to date of payment. *See* Drakes Bay Land Co. v. United States, 459 F.2d 504, 511–512, 198 Ct.Cl. 506, 520–521 (1972); Eyherabide v. United States, 345 F.2d 565, 571, 170 Ct.Cl. 598, 608 (1965); Fonalledes v. United States, 107 F. Supp. 1019, 1022–1023, 123 Ct.Cl. 483, 503–504 (1952).

### FINDINGS OF FACT

1. Plaintiff is a resident of Saipan, Mariana Islands and a citizen of the Trust Territory of the Pacific Islands.

2. Plaintiff filed the petition in this action on October 14, 1968. He claims just compensation for defendant's deprivation of his use and occupancy from 1944 to 1968 of approximately 5 hectares of land on Saipan, described generally as lots 297, 299, 302 and 330, and for the destruction of 800 coconut trees thereon.

3. From approximately 1914 to 1944 Saipan was under Japanese rule, for most of such period under authority of a mandate from the League of Nations. Saipan was invaded by the military forces of the United States on June 15, 1944 after a heavy 4–day bombardment. Organized resistance by the Japanese continued until July 9, 1944, when the island was declared "secured." Military government was established on Saipan on June 19, 1944. Proclamation No. 1, issued on that date by Admiral C. W. Nimitz, United States Navy Commander in Chief, United States Pacific Fleet and Pacific Ocean Areas, Military Governor of the Mariana Islands, set forth the assurance that "property rights will be respected and existing laws will remain in force and effect" except insofar as specifically changed. However, the local people were put in protective custody in a fenced-in area where they remained until July 1946, a period of 2 years, except for work details under guard.

4. As a result of the heavy fighting all of the public land officer records, including the survey maps, were lost. Furthermore, this relatively small island with a native population of 3,500 plus 15,000 Japanese civilians at the start of World War II was almost totally reconstructed by the bulldozers of American military engineers who covered the island with paved roads, airstrips, fuel and ammunition dumps, warehouses, pipelines, power lines, military quarters and training areas to accommodate up to 200,000 troops, in preparation for the

2. The record is confusing as to how plaintiff could have retained ownership of any lots at all if his original claim was correct. He claimed 16 hectares, but the Area Property Custodian vested 5 hectares and plaintiff exchanged 11 more with the Trust Territory Government. Nevertheless, neither the land title officer, the High Court, nor defendant disputes that three or four additional lots remained. The explanation may well be that because of the loss of the original Japanese land surveys, plaintiff was mistaken in believing that his father's land measured only 16 hectares. The stipulation that the value of the use and occupancy of the four lots was $50 per year is not conditioned upon the lots measuring up to any particular size.

invasion of Japan. Nearly all of the individual monuments which marked the corners of land parcels were missing. The American Military Government was able to piece together enough parts of Japanese cadastral maps of Saipan to cover the entire island; but while this located a land parcel with respect to adjoining parcels, it was not accurate enough to retrace prewar boundaries, lot and block numbers, or ownership. Thus when the local people regained their freedom the new maps were drawn, it became necessary for them to file claims to ownership of individual tracts, with very few having any documents to prove ownership.

5. In 1947 the United States and the United Nations agreed to a trusteeship for the former Japanese-mandated Pacific Islands with the United States as the administering authority. (61 Stat. 3301 and 397.) Military government on Saipan ended on July 18, 1947, when the Joint Resolution of the United States Congress approving the trusteeship went into effect. By Executive Order 9875 of July 18, 1947, 3 C.F.R. 1943–1948 comp., at 658, responsibility for civil administration of the Trust Territory was initially delegated to the Secretary of the Navy on an interim basis, who on the same day delegated it to a High Commissioner. (Trust Territory Code, at xviii-xxi (1952 ed.).)

6. On December 29, 1947, the Deputy High Commissioner, Trust Territory of the Pacific Islands, issued Trust Territory Policy Letter, P–1, prescribing land policy to be followed in the administration of the Trust Territory, including Saipan, and setting guidelines with respect to the determination of the validity of prewar land transfers. It stated in part:

5. The guiding principle of land policy is to safeguard native land rights and land ownership; and so far as possible, to provide each family with land sufficient for adequate subsistence, and to assure community-wide access to essential land resources.

\* \* \* \* \* \*

14. Public interest during the war and the immediate post war period require seizure of private property, and in some cases the construction of military and government establishments thereon. Occupation of private property without compensation to lawful owners still continues in some localities. This condition must be rectified as soon as possible, for it is the policy of the United States that the owner or owners of private property required for public use shall be properly compensated for the loss of property taken.

\* \* \* \* \* \*

17. When it is necessary to retain privately owned land for government purposes, it is preferable from all points of view that the owner or owners, including those holding remainder or reversionary rights, be compensated by award of title to other land, rather than by cash payment. Government owned land, including public domain, may be used for this purpose, after determination of the extent of the government interest and of any private interests remaining therein, if an agreement fair to the former owner and to the government can be reached. When such an agreement cannot be effected, cash compensation from date of seizure is in order. Civil administrators are authorized to initiate payments of rental, at reasonable rates, for land occupied by civil government activities.

7. After World War II United States Military Forces continued to occupy large areas of the island. However, it was not until about 1950 that the Department of Defense decided which areas of Saipan it wished to keep as military retention areas. It retained approximately 5,000 hectares, of which 400 were in 137 separate privately owned tracts. Such owners were offered exchanges of equivalent values in public land for their privately owned tracts.

In the exchanges the Trust Territory Government became the owner of the formerly private land and leased it to

the United States Department of Defense, with the further understanding that the Department of Defense would review its needs every 5 years and release unneeded land to the Trust Territory Government. In return the United States Government paid the Trust Territory Government at the rate of $40 per acre of retained land. (One acre equals 0.4 hectares.) The exchange program got under way in 1953, and eventually 723 hectares of public land were given for the 400 hectares of private land.

8. Trust Territory Office of Land Management Regulation No. 1, originally issued January 11, 1951, provided for the filing of a claim by every person claiming an interest in land used or occupied by the United States. A title officer was authorized in each district to determine, after due notice and hearing in accordance with the regulation, the ownership of any tract of land in the district which was used, occupied or controlled by the Government, and to appraise, evaluate and recommend for settlement any claim for damage, rent or alienation resulting from such use or occupation. Notice of all hearings was to be posted publicly and to be given to all parties of record. Provision was also made for appeal from the land title officer's determination to the Trial Division of the High Court of the Trust Territory.

9. By Executive Order 10265 dated June 29, 1951, 3 C.F.R. 1949–1953 comp., at 766, effective July 1, 1951, administration of the Trust Territory was transferred from the Secretary of the Navy to the Secretary of the Interior. In the exercise of such authority, by Department of Interior Order No. 2658, dated August 29, 1951, the Secretary provided that the interim regulations of the Trust Territory in effect on July 1, 1951, were to remain in effect until changed and he vested the "executive" authority of the Government of the Trust Territory in the High Commissioner. On June 29, 1953 the High Commissioner substantially readopted Office of Land Management Regulation No. 1.

10. Prior to the start of World War II plaintiff's father, Vincente D. de Castro (now deceased), owned at least 16 hectares of land in the Marpi area of Saipan, of which approximately 5 hectares were leased to a Japanese citizen named Kudaku Taru.

11. All of such land was occupied by United States Military Forces during the invasion of Saipan, commencing June 15, 1944. Many coconut trees were destroyed during the invasion, of which 800 had been located on the land at issue.

12. On December 19, 1944, Vincente D. de Castro, plaintiff's predecessor, executed claim No 129 asserting ownership of the 16 hectares of land and presented it to the military government which was then commencing reconstruction of the land record of Saipan. Vincente having died in 1946 and no action having been taken on that claim during his lifetime, on February 21, 1948, Gregorio P. Castro, the plaintiff and son of Vincente, executed a second declaration of land ownership for the same 16 hectares under claim No. 129 on behalf of the heirs of Vincente.

13. Prior to hearing on plaintiff's claim, at some time during 1951 the Area Property Custodian of the Trust Territory (later Alien Property Custodian) vested title to portions of the property on the ground that they were owned by Japanese nationals. However, Gregorio P. Castro then being employed on a ship away from Saipan, on September 16, 1953 Sister Remedios de Castro, as representative of the heirs of Vincente D. de Castro, executed and filed a statement in support of claim No. 129, reaffirming that all of the property had been owned by her late father, Vincente, and that the Japanese nationals had been lessees and not owners.

14. After a hearing in October 1953, at which the heirs of Vincente D. de Castro were represented by Sister Remedios de Castro, in November 1953 the land title officer for the Saipan district issued determinations of ownership Nos. 740, 741 and 742 with respect to claim

No. 129. In determination No. 740 he ruled that part of lot 305 and all of lot 317, which had in form been leased to Kudaku Taru for a 30–year term beginning in 1924 for which the compensation was paid in advance, and which consisted of approximately 5 hectares, was property owned by a Japanese national vested in the Area Property Custodian. In determinations Nos. 741 and 742 with respect to lots 303, 304, 314, 326 and the remainder of lot 305, consisting of about 11 hectares, he ruled that they were owned by the heirs of Vincente D. de Castro but they were not entitled to possession because it was "part of a U. S. Retention Area." He made no determination with respect to lots 299, 302 and 330, also encompassed by claim No. 129.

15. In December 1955, both Sister Remedios de Castro and Gregorio P. Castro executed agreements to exchange lots 303, 304, 314, 326 and part of lot 305, consisting of 11 hectares, for other lands which had been offered to them by the Government of the Trust Territory of the Pacific Islands. In April and May 1956, Sister Remedios de Castro on behalf of the heirs of Vincente D. de Castro executed a quitclaim deed conveying to the Government of the Trust Territory lots 303, 304, 314, 326 and part of lot 305. In return, in April 1956, the Trust Territory Government executed grants of portions of the public domain of the Trust Territory to the heirs of Vincente D. de Castro in accordance with the agreements to exchange lands. For the 11 hectares they received 33 hectares of other land.

16. Although the United States did not claim the remaining portions of the land in claim No. 129 as a military retention area, it prevented plaintiff from occupying or using such property until 1968. It stockpiled ammunition in the Marpi area of Saipan, where plaintiff's land was located, until 1949. It then initiated a program of planned destruction of such ammunition, but an uncontrolled explosion of unexpectedly large proportions at an ammunition dump in the spring of that year scattered live projectiles, shells and grenades throughout the Marpi area, and thereafter defendant barred use or occupation of the region as hazardous. In 1951 the United States used the area for the restricted operations of a military organization known as the Naval Technical Training Unit (NTTU), which remained there until 1962. After NTTU, left, the Marpi area remained closed because of the dangerous conditions and entry was not allowed except by pass or permit. It was not until September 20, 1968, that the land was declared cleared of live explosives and unrestricted use and occupancy of property was permitted.

17. In December 1965 in Civil Action No. 158, Remedios P. Castro, daughter, filed a petition in the Trial Division of the High Court for the Trust Territory, seeking distribution of the estate of Vincente D. de Castro to his son, Gregorio P. Castro, as legal heir. In 1967 Gregorio was substituted as petitioner. Gregorio claimed that his father had owned approximately 16 hectares; that in 1948 he had filed claim No. 129 for such property; that in 1953 the Land and Claim Office had improperly determined that his father had sold 5 of the 16 hectares; and that the exchange of the 11 hectares should be set aside as involuntary and unauthorized. He listed the lot numbers involved as 302–307, 313–317, 325, 326, 329, 330, 360, and 1299. (The court found that there was no lot 1299 in the Marpi area and treated the reference as 299.)

The land title officer, by a Deputy Attorney General for the Trust Territory, entered an appearance in such action to object to the petition on the ground that the lands enumerated therein were not owned by heirs of Vincente D. de Castro. He asserted that the decedent had disposed of some of the lots to Japanese interests before the war and that they had become vested in the Area Property Custodian; that those lots which had not been vested were owned by the Trust Territory Government pursuant to the exchange agreements and transfers thereunder whereby the petitioner had acquired 33 hectares of other land for the aforesaid 11 hectares; and that to

the extent any of the lots were not covered by the title determinations in 1953, such determinations amounted in effect to a determination that the heirs of Vincente D. de Castro did not own such land.

18. On March 27, 1968 the Trial Division of the High Court entered a preliminary judgment in such action. In the judgment order the Court noted that, although the action would normally have been one primarily between the heirs, the objection by the land title officer that the lands were not owned by the heirs caused the action "to involve first a determination of whether the heirs or any of them were owners." It ruled that the parties were bound by the land title officer's determination of ownership No. 740 with respect to the vesting of two of the lots in the public domain and by determinations of ownership Nos. 741 and 742 which had denied possession of various other lots to the plaintiff because they had been retained for military purposes. It also found that in 1955 and 1956 plaintiff had voluntarily exchanged the property covered in determination Nos. 741 and 742 for 33 hectares of other property, and that this was acquiesced in by all other heirs. Accordingly the Court dismissed the action with respect to lots and house sites Nos. 303–307, 313–317, 325, 326, 329, and 360. To this extent it sustained the position of the objector, the land title officer. It held, however, that there had been no determination of ownership with respect to lots 297, 299, 302 and 330, and it reserved jurisdiction to adjudicate the petitioner's claim for distribution of such lots in a subsequent trial. To that extent it denied the land title officer's motion to dismiss. The land title officer did not appeal this decision to the Appellate Division of the High Court.

In May 1968 the Trial Division of the High Court held another hearing with respect to ownership of lots 297, 299, 302 and 330. On this occasion, a new Attorney General having taken office, he declined to take any further action on behalf of the land title officer as an objector and presented no evidence with respect to the four lots. By judgment order dated May 17, 1968 the Court then held that, "As between the parties and all persons claiming under them, including all heirs of Vincente D. de Castro, the land known as lots 297, 299, 302 and 330 * * * are owned by the petitioner Gregorio P. Castro" free and clear of the claims of any other heirs; that absent any appeal, "this judgment shall operate to transfer to said Gregorio P. Castro, as his individual property, all right, title and interest which said Vincente D. de Castro has in and to said lands at the time of his death"; and that "the Land Title Officer * * * is requested to note this judgment in his records." No appeal was taken by anyone from such judgment and the time has expired for any such appeal.

19. Lot 297 does not appear as a part of any claim No. 129 filed either by the plaintiff, his predecessor or his sister. Nor does it appear in the petition for distribution in civil action No. 158. The first mention thereof is in a pretrial order in that action wherein the land title officer stated that lot 299 claimed by petitioner was actually only a farm-house site number included in lot 297. Neither of the judgment orders explained how it arrived at the determination that plaintiff owns lot 297. This record in Civil Action No. 158 was not placed in evidence in this case.

20. Plaintiff was unable to obtain any independent evidence of the value of the property claimed to have been taken by the United States. Accordingly he agreed at trial to such evidence of value as the defendant would have offered. It was stipulated that if there was any taking by the United States the reasonable value of the use and occupancy of all four lots by the United States from 1944 to 1966 was $50 per year and that value of approximately 800 coconut trees on such property which had been destroyed was $5 per tree.

## CONCLUSION OF LAW

Based upon the foregoing findings of fact and conclusions of law, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover $1,100, plus an additional sum computed at the rate of 4 percent per annum from September 1, 1957 to date of payment, as a part of just compensation.