**Kabua KABUA et al.**

v.

**The UNITED STATES.**

**No. 119–75.**

United States Court of Claims.

Dec. 15, 1976.

Stephen N. Shulman, Washington, D. C., attorney of record for plaintiffs; Joseph A. Artabane and Cadwalader, Wickersham & Taft, Washington, D. C., of counsel.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen. Peter R. Taft, Washington, D. C., for defendant.

Before SKELTON, NICHOLS and KASHIWA, Judges.

### ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge.

The plaintiffs have brought this action to recover for an alleged uncompensated taking of Roi-Namur Island. The parties have filed voluminously documented cross motions for summary judgment. Among other defenses, defendant sets up the jurisdictional bar of our six-year statute of limitations, 28 U.S.C. § 2501, which applies to all claims in this court. Since we determine that the suit is barred for that reason, we need not consider the other matters the parties have briefed and argued, and we do not do so.

Plaintiffs say they are the indigenous landowners of Roi-Namur, which is a Micronesian island, part of the Marshalls, a component of the Trust Territories of the Pacific islands, which the United States administers under its Trusteeship Agreement with the United Nations, 61 Stat. 3301. Thus, the chief executive of the government of the Trust Territory, a High Commissioner, is appointed by the President of the United States with the advice and consent of the Senate. Since 1960, the United States has been using Roi-Namur with the permission of the Trust Territory government, which consented to United States occupancy in consideration of payment of $80,000. Under this Use and Occupancy Agreement, the United States' needs for the lands are to be reviewed by it each five years, and the land is to be returned to the Trust Territory when no longer needed.

The groups of plaintiffs, comprised of head chiefs (Iroij), lesser chiefs (alabs), and tenants (dri jerbal), or their ancestors, had inhabited Roi-Namur when Japan assumed control over the territory under a League of Nations mandate. The Japanese government at some time before 1944 built an airbase there, filling in a lagoon and joining Roi and Namur, which had hitherto been two separate islands. They expelled the natives, and the plaintiffs resided elsewhere until after World War II. There is evidence that the Japanese purported to pay compensation, but whether to the right persons and in adequate amounts, we need not determine. In February 1944, United States forces overwhelmed the Japanese garrison in a bloody battle, and thereafter used Roi-Namur as a base until hostilities ended.

In 1949 the Navy suffered a few Marshallese to return to Roi-Namur. That they were the plaintiffs or any of them is not asserted. In 1960 they were removed, leaving behind eight dwellings, a church, and some thirty other structures. Since 1960 no Marshallese person has been allowed to reside upon or use Roi-Namur. The island then became and now is part of the Kwajalein Missile Range. There are structures and improvements, of value approximately $100,000,000, added to the realty in furtherance of this use, since 1960. The Use and Occupancy Agreement does not refer to or recognize any native claims, but rather seems to visualize that on the termination of the present use, the island will revert to the Trust Territory government as part of its public domain.

On June 29, 1953, the High Commissioner had approved Office of Land Management Regulation No. 1, which announced the procedures before the Land Management Administrator for the adjudication of claims of land ownership throughout the Trust Territory. Section 3 of the Regulation further authorized an appropriate official to release to the owner any tract of private land that was no longer needed by the United States. In November 1962, and again in March 1964, the Trust Territory government published notice that Roi-Namur was considered public land owned by the government, but invited the submission of any private claims. The plaintiffs in this action filed claims under the Regulation in regard to the land on Roi-Namur in 1963 and 1964, objecting that the land granted to the United States was private property and not in the public domain subject to the disposition of the Trust Territory government. The Land Management Administrator determined that the "Iroij" rights in the land were in the plaintiffs. There has been no formal appeal of this determination, but the defendant does not agree with it.

Although their title to the lands occupied by the United States under the Use and Occupancy Agreement had been recognized to that extent, plaintiffs did not seek to eject the United States, but only to obtain the compensation ostensibly due them. Accordingly, by their letter to the High Commissioner dated December 1, 1965, plaintiffs said they agreed to allow the United States to retain undisturbed possession of the land, pending negotiations toward compensation. Since then they have dealt with and managed their claim as a money claim entirely. Negotiations toward plaintiffs' conveying to the United States a long term lease for a consideration did commence, but continued without success through 1974. When plaintiffs were convinced that continuing with negotiations would be unavailing they filed suit here, April 15, 1975. The parties seem to agree that the United States will pay something, but are wide apart as to what payment would be fair and just. An appraisal was made in 1970 proposing a rental value of Roi-Namur at $7,666.67 per acre as a lump sum for a 50 year period to end February 6, 1994. The Navy has rejected it.

The law is clear that to avoid the bar of § 2501, *supra*, the claimant must bring his suit within six years of the taking date. *Hilkovsky v. United States*, 504 F.2d 1112, 205 Ct.Cl. 460 (1974); *Camacho v. United States*, 494 F.2d 1363, 204 Ct.Cl. 248 (1974). We pass over any happening before 1960, but since that date the United States has been in open and notorious possession under claim of right, and has made large improvements, under an agreement with the Trust Territory which purported to act as the owner. The Navy's possession is indeterminate in duration, subject only to a return of the island to the Trust Territory at some time when, by the Navy's own unilateral determination, its use is at an end. If the suit is one to try title, as plaintiffs seem to express it at times, it is cognizable in this court on a taking theory. *Bourgeois v. United States*, 545 F.2d 727, 212 Ct.Cl. ——, (decided November 15, 1976). The facts are consistent with no other view than that whatever ownership the plaintiffs have was taken long since.

The plaintiffs seek to avoid the bar by saying they were entitled to wait until the duration of the taking was announced, since

it was avowedly temporary. They cite *United States v. Dickinson,* 331 U.S. 745, 749, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947); and *Castro v. United States,* 500 F.2d 436, 205 Ct.Cl. 534 (1974).

The former case is by *United States v. Dow,* 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958), more or less limited to the class of flooding cases to which it belonged, when the landowner must wait in asserting his claim, until he knows whether the subjection to flooding is so substantial and frequent as to constitute a taking. *Dow* holds the usual rule to be that the taking occurs when the United States first enters into possession, and not when it acquires title. P. 22, 78 S.Ct. 1039. In *Castro,* the opinion outlines a temporary taking for varying and different temporary reasons, the first, the presence of an ammunition dump in the area, next the stationing of the NTTU, and finally because of the hazards of live explosives buried in the soil. But the land was never included in the military's list of lands designated for military retention areas. It is easy to see superficial similarities since the *Castro* lands were on Saipan, in the Pacific war zone and the subsequent Trust Territory. But here we have a use commenced in 1960 and never subsequently varied, with long retention obviously visualized in view of the large construction of facilities. The mere possibility of a reverter after the missile range use might be unilaterally declared to be at an end, can in no way serve to toll the statute in the same manner as the varied and multiple uncertainties as to the taker's intentions, spelled out in the *Castro* decision. Here, in a timely suit, plaintiffs could have successfully urged that as of a 1960 taking date, the possibility of a reverter was too remote and uncertain to impede the prompt ascertainment of an award, which necessarily would, with respect to *quantum,* have been not materially less than the entire value of the land taken as a fee simple.

As held in *Camacho,* the land title proceedings before the Land Management Administration did not toll the statute. Nor can mere settlement negotiations, as conducted subsequently, ever do so. The United States was not a party before the Land Management Commissioner, and his determination for plaintiffs could not and can not be taken as determining that the United States was not in possession as a taker at the time. At most it qualifies them as claimants, or purports to do so. Accordingly, we think the statute of limitations had run on the taking claim before the petition was filed herein.

Plaintiffs also rely on what they call an implied-in-fact contract. They interpret their letter of December 1, 1965, as permitting the continued occupancy by the United States, conditioned on payment of compensation. Though addressed to the Trust Territory Commissioner, somehow it embodied a contract with the United States. Presumably it was in their view an offer, accepted by continued occupancy and by conduct of negotiations to determine the quantum of compensation. Whether inadvertently or not, defendant lent some support to this view by admitting in its answer a petition allegation that it held possession "under the terms of the December 1, 1965, Iroij letter." It seems clear from all the facts submitted on the cross motions that defendant is holding under its 1960 Use and Occupancy Agreement with the Government of the Trust Territory. If, however, plaintiffs conveyed any interest in 1965, this was still over nine years before suit was brought and the negotiations for the pecuniary *quid pro quo* have or should have gone on almost as long. By the 1965 letter, they were to commence "at an early date." A claim on an implied contract with the United States is held to accrue "when it can be definitely ascertained and set up, when all that is required of him by the terms of the contract has been fulfilled by the contractor." *Steel Improvement Co. v. United States,* 355 F.2d 627, 630, 174 Ct.Cl. 24, 28 (1966). We hold, therefore, that any possible claim founded on an implied-in-fact contract accrued more than six years before suit was brought.

The plaintiffs say that on February 14, 1974, the United States Office of Manage-

ment and Budget ousted the Trust Territory Government and its "overseer," the Department of the Interior, from conduct of the settlement negotiations, and substituted the Department of Defense. We see no way by which this act could be held to toll the statute or accrue a new claim. Of course any suit whenever brought would all along have had to be predicated on the proposition that the United States, not the Trust Territory Government, was the taker in possession or the party who made the contract implied-in-fact. If the obligation to be enforced was that of the latter, the Trust Territory, jurisdiction here would be lacking on another ground. *Porter v. United States*, 204 Ct.Cl. 355, 496 F.2d 583 (1974), *cert. denied*; 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975).

Plaintiffs also assert support of their claim by the United Nations Trusteeship Agreement; however, the general obligation thereby created, to protect the natives against the loss of their land and resources, does not add anything to our jurisdiction as Congress has spelled it out. This does not include claims founded on treaties, 28 U.S.C. § 1502, but if it did, the six year period of limitations would apply still, and bar the claim.

Our inability to resolve the long impasse on quantum is no doubt regrettable, since it is doubtful whether plaintiffs can recover anywhere else against the taker in possession. However, our jurisdiction is always strictly construed because it depends on the consent of the sovereign to be sued, and is not to be extended by implication. *United States v. King*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969); *United STates v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Here, as in the cases cited, our desire to be of service is countervailed by the limitations on our jurisdiction. It would appear, however, that the willingness of defendant to pay something here is possibly based as much on moral as on legal grounds. The former category does not weigh in this court, unless it is made a legal ground by statute. Defendant's able counsel must resist every claim with every available defense, that private counsel might properly use to defend a private client. Therefore, plaintiffs are often astounded to encounter objections to the very existence of their claims, that were not heard of or not urged in the prior negotiations. Our recognition that the Statute of Limitations defense is valid enables us to ignore others that could well be equally decisive here. The reader must not suppose that defendant has allowed them to appear waived or neglected. In general, we think a tribunal like this is not likely to be able to come up with a morally satisfactory resolution of a native or tribal claim, unless it has the support of special jurisdictional legislation comparable in its thrust to the Indian Claims Commission Act of 1946, 25 U.S.C. § 70 and ff., which allows enforcement of specified kinds of moral claims, not that we urge it as a model to follow in all details. Better yet perhaps it may be to relieve poverty where it is found, without going through elaborate and costly ritual designed to show that compensation is being assessed for an ancient wrong. Plaintiffs' able counsel has done as much as anyone could for his clients, but the Tucker Act, 28 U.S.C. § 1491, just simply is not an implement suited to his need.

Accordingly, upon review of the motions and supporting documents, and upon briefing and oral argument, it is ordered that plaintiffs' motion for summary judgment is denied, defendant's motion for summary judgment is allowed, and the petition is dismissed.