Maria Akiyama ALDAN,
Plaintiff-Appellee,

v.

Ramon KAIPAT, et al.,
Defendants-Appellants.

No. 85–2245.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 15, 1986.

Decided July 17, 1986.

Michael A. White, White & Novo-Gradac, P.C., Saipan, CM, for plaintiff-appellee.

Douglas F. Cushnie, Saipan, CM, for defendants-appellants. ·

Before NELSON, CANBY, and JOHN T. NOONAN, Jr., Circuit Judges.

NOONAN, Circuit Judge.

This case, involving title to land in Saipan, is an appeal from the Appellate Division of the District Court for the Northern Mariana Islands which affirmed a judgment of the trial court of the Commonwealth of the Northern Mariana Islands. We have jurisdiction under 48 U.S.C. § 1694b(c). We affirm the Appellate Division.

BACKGROUND

In 1944 the Mariana Islands, especially Saipan, became as strategically vital to the defense of the Empire of Japan as they were to the American offensive across the Pacific. Alexander Spoehr, *Saipan: The Ethnography of a War-devastated Island* (Fieldiana: Anthropology, Vol. 41, Chicago Natural History Museum, 1954), at 90. Japan had built two airstrips on Saipan and had introduced 26,000 troops to defend them. On June 11 and 12, 1944, U.S. carrier aircraft attacked Saipan. "On June 13 and 14, the island was subjected to heavy bombardment by battleships, cruisers, and destroyers.... On June 15, the American assault forces commenced landing on the southern lagoon beach on the west coast of the island.... Despite the intensity of the preinvasion bombardment, it had not been crippling, and fierce resistance was immediately encountered by the assault troops. In the first forty-eight hours there were 4,000 American casualties." *Id.* at 91. From June 15 to July 9 American casualties would mount to 14,224, with 3,144 men killed in action. "Of the Japanese force, 28,811 were killed and 1,810 taken prisoner." *Id.* Loss of life among Japanese civilians was heavy, as it was among the island's indigenous peoples, the Chamorros and the Carolinians.[1]

1. The Chamorros of Saipan have not resided    continuously on the island since the early days

Among those who died on Saipan during the fighting was Pedro Akiyama, a civilian Japanese national and the husband of a Chamorro woman, Maria Avelina Reyes Akiyama. Their daughter, Maria Akiyama Aldan, is here the plaintiff, representing her father's heirs. She has brought this action to quiet title to Lot 1916 of the Iliyang area, approximately 4.32 acres on the shore of the Garapan District of Saipan.

The battle for Saipan not only brought about Pedro Akiyama's death. It destroyed many land records. Saipan was a shambles. The American military occupation of the island obliterated buildings and other landmarks. The resolution of title disputes after the war could not be by the easy way of consulting a registry of deeds or tracing the path of boundary markers. Despite these difficulties, the Trust Territory Land Office in 1953 "after due public notice and private notice to all parties as of record, and after public hearings" (so the Land Office's "Determination of Ownership No. 673" states) vested title to the land here in dispute, described as "the property of Pedro Akiyama, a Japanese national," in the Alien Property Custodian.

Three years later the Land Office treated this order as a mistake, presumably because Pedro Akiyama had died before American sovereignty had been established. The Land Office regarded his heirs who were not Japanese nationals as suc-

ceeding to his title. Accordingly, the Land Office issued an Amended Declaration of Ownership, releasing the property to "the heirs of Pedro Akiyama, represented by Maria R. Akiyama as Land Trustee."

The title of the heirs of Pedro Akiyama is resisted in this action by the heirs of Vicenta Rapugao. In 1938, both parties agree, Vicenta Rapugao, a Carolinian woman, owned the entire area known as Iliyang. Her granddaughter, Magdalena Kaipat, is the representative of Vicenta Rapugao's heirs and the administrator of her estate. Joined in this case by her brother Ramon, she contends that her mother never sold the land to the Akiyamas. She maintains that the Land Office determination in 1953 and its amendment in 1956 were without effect as to her mother's title because her mother never received notice of the proceedings. Magdalena Kaipat further contends that she was prejudiced in the trial of the action in the Commonwealth court in 1983 by the court's reliance on the Land Office decisions: in practical effect she was put on the defensive, and the Akiyama claimants started the case with an unfair advantage based on a void order. Her position is that she has been denied due process of law.

*Issue:* Were the defendants denied due process of law by the trial court's reliance on the Land Office decisions?

*Analysis:* Section 501 of the Covenant between the Commonwealth and the United

---

of Spanish contact. "The original Chamorro population was removed from Saipan by the original Spanish conquerors and for nearly a century and a half no Chamorros lived on the island. It was not until the latter half of the nineteenth century and the early years of the twentieth that Chamorros returned in numbers as permanent residents, migrating from Guam, with a few also from Rota." Spoehr, at 25. "Modern Chamorro culture received its primary patterning after the Spanish first seized control of the Marianas in the seventeenth century.... In the following century and a half, Chamorro culture was transformed into a Hispanicized Oceanic hybrid." *Id.* at 24–25.

"In 1815, before Chamorros were returned to Saipan, groups of Carolinians (natives of the Caroline Islands) received permission from the Spanish government to settle on Saipan after their home islands were devastated by a typ-

hoon. Caroline islanders continued to migrate to the island through out the 19th century." Richard G. Emerick, "Land Tenure in the Marianas," *Land Tenure Patterns in the Trust Territories of the Pacific Islands* (The Staff Anthropologist, Trust Territory of the Pacific Islands, Guam 1958), at 220. The first people to resettle Saipan after the forcible removal of the Chamorros in the seventeenth century, the Carolinians have maintained their own culture, although it has been much modified by the successive Spanish, German, and Japanese (and after 1944, American) administrations. But the culture "does not conform to the basic Spanish-Oceanic pattern of Chamorro culture. The Carolinians retain their own language for use among themselves, though most of them also speak Chamorro, ... [the island's] dominant tongue."

States declares that the Fourteenth Amendment, section 1 applies to the Northern Mariana Islands as if they were one of the several states, see *Commonwealth of the Northern Mariana Islands v. Atalig,* 723 F.2d 682, 685 (9th Cir.1984). In the exercise of the appellate jurisdiction given us over the Northern Marianas, we inquire whether due process of law was denied the defendants.

The evidence of the title of the heirs of Pedro Akiyama, other than the Land Office Determinations of Ownership, was not overwhelming. Some testimony pointed to ownership by Maria Reyes Akiyama, Pedro's Chamorro wife. The Appellate Division held that the evidence supported the ruling of the trial court that Vicenta Rapugao conveyed Lot 1916 to Pedro Akiyama and Maria Reyes Akiyama in 1938. Because that decision has support in the record it comports with due process.

The defendants are right in contending that the Land Office Determinations exercised a preponderant influence with the trial court in its finding that Pedro Akiyama had had title to the land. We make no independent judgment of the correctness of the Land Office rulings. But if the Land Office Determinations were void for lack of due process, the question we would have to address would be the fairness of a trial where void Determinations were decisive. We do not, however, need to reach this question.

The Land Office Determination of Ownership in 1953 effectively barred Vicenta Rapugao and her heirs. The time for an appeal from this determination expired, according to established law, one year after the determination, see *Jablotoh v. Ebup,* Trust Territory High Court Certiorari No. C–5–84 (App.Div.1985). The general statute of limitations on actions for the recovery of land requires commencement of the action within twenty years of its accrual, 67 C.R. sec. 302(1), so that even if Vicenta Rapugao had been deprived of notice in 1953 or 1956 her claim would by now have lapsed. We see no basis, however, for doubting the Land Office's declaration that proper public and private notice had been given. The Land Office's proceedings, so far as they are observable in this case, complied with the requirements of due process. The trial court's reliance on them accorded them the weight they ought properly be expected to have. No due process is violated by essential time limits on appeals and collateral attacks on the determination of title.

AFFIRMED.