**E-FILED**
**CNMI SUPREME COURT**
E-filed: Jun 28 2024 03:46PM
Clerk Review: Jun 28 2024 03:47PM
Filing ID: 73510739
Case No.: 2023-SCC-0004-CIV
NoraV Borja



IN THE

# Supreme Court

OF THE

# Commonwealth of the Northern Mariana Islands

---

**IN THE ESTATE OF RITA ROGOLIFOI,**
*Plaintiff-Counter-Defendant-Appellant,*

*v.*

**IN THE ESTATE OF SILVESTRE ROGOLIFOI,**
*Defendant-Counter-Plaintiff-Appellee.*

**Supreme Court No. 2023-SCC-0004-CIV**

---

**SLIP OPINION**

**Cite as: 2024 MP 4**

Decided June 28, 2024

---

CHIEF JUSTICE ALEXANDRO C. CASTRO
ASSOCIATE JUSTICE JOHN A. MANGLOÑA
ASSOCIATE JUSTICE PERRY B. INOS

---

Superior Court Civil Action No. 18-0210-CV
Judge Pro Tempore Arthur R. Barcinas, Presiding

---

MANGLOÑA, J.:

¶ 1     Appellant Estate of Rita Rogolifoi ("Rita Estate") contests the trial court's order finding that a 1953 Title Determination erroneously named the Estate of Rita Rogolifoi as the landowner and failed to provide notice to the heirs of her brother Silvestre Rogolifoi ("Silvestre"). For the following reasons, we REVERSE and REMAND to the lower court to enter judgment in favor of Rita Estate.

## I. FACTS AND PROCEDURAL HISTORY

¶ 2     In February 2018, Antonio Rogolifoi Rasiang ("Rasiang") filed an appearance in the probate of the estate of Rita Rogolifoi, stating his intention to quiet title to land located in As Mahetog, Saipan. Rasiang claimed that Rita Rogolifoi ("Rita") inherited her property through her father as trustee for the family, including Rasiang's grandfather and Rita's brother, Silvestre. In June 2018, Rita Estate filed a quiet title action against the Estate of Silvestre Rogolifoi ("Silvestre Estate"), arguing that the statute of limitations, administrative res judicata, and laches all barred Silvestre Estate's claims. Silvestre Estate counter-claimed ownership of half the property and damages from a related judgment.

¶ 3     The disputed property in As Mahetog—Lots 616, 629, and 630—is the subject of Title Determination 667, an October 1953 decision issued by the Saipan District Land Office of the Trust Territory of the Pacific Islands. The Title Determination states that the As Mahetog properties were "determined as the property of the heirs of Rita Rogolifoi, represented by Dolores Saralu as trustee." Ex. O at 1. The Title Determination specifies that the decision was made "after due public notice and private notice to all parties as of record, and after public hearings at which persons claiming an interest in the land described had the opportunity to be heard." *Id.* The Title Determination's final page is stamped with the number 18W-005300. The parties to this appeal agree that any contemporary supporting documents for the Title Determination have been lost to history.

¶ 4     The land records file, however, did contain two other written statements. The first was a form Statement of Ownership for the three As Mahetog lots executed by Rita in December 1944. The Statement was written in English and declares that Rita inherited the three lots from her father Pedro Rogolifoi ("Pedro") in 1886, but does not have title papers for the land. On the signature line is a thumb print, purporting to be Rita's, with the date December 29, 1944. The Statement was witnessed and the land ownership was verified by Japanese records. The Statement was also sworn to have been read aloud in Chamorro and English before being signed. It is stamped with the number 18W-005314.

¶ 5     The other document filed with the Title Determination is an undated statement by Dolores Saralu ("Saralu"), Rita's eldest surviving daughter and the trustee named in the Title Determination. Saralu states that she represents her mother Rita and the "land has been inherited from our mother's [sic] Rita Rogolifoi." Ex. N at 1. Saralu continues to state that the land came from the German government, and she acknowledges an exchange of the property falling

within the US Retention Area for land in Garapan. The two-page document is handwritten, signed by Saralu, and numbered 18W-005305 and 18W-005306.

¶ 6        In 2003, Rita Estate filed an action to recover the lots identified in the Title Determination that were taken by the Commonwealth. Two years later, the Marianas Public Land Authority sued Rita Estate to quiet title on those lands being leased to commercial enterprises. Rita Estate successfully defended its claim to the As Mahetog property and was awarded damages of over $2 million. *MPLA v. Heirs of Rita Rogolifoi*, Civ. Act. No. 05-0197A (NMI Super. Ct. May 7, 2009) (Amended Order Granting Prejudgment Interest Rates for Government Taking of Lots 630-1R/W and 630-2R/W). Partial distribution was made to Rita Estate in 2017 following an unsuccessful challenge by a claimed heir of Pedro through Silvestre's lineage.

¶ 7        The trial court in the instant quiet title action held an evidentiary hearing in May–June 2019, including the testimony of 8 witnesses. Relevant to this appeal, Francine Agulto ("Agulto") was called as a factual witness for her role as the title abstractor for the As Mahetog property. Agulto testified that title determination proceedings would include "a notice given out to all the neighbors to show up to the hearing that a certain person or family is claiming the property to be theirs." Tr. at 302. She stated that personal notice would be given to neighbors and public notice made by posting in a public place. *Id.* at 303. Agulto further testified that she was not aware of any notice of a title determination being made personally to "a family member or somebody who might potentially have an interest in the property." *Id.* at 331.

¶ 8        Concepcion Togawa ("Togawa"), who appeared both as a factual witness and as an expert witness in land title research, agreed with Agulto that the land claims process included public and private notice that the claim was made by a certain person, but did not know if that process was actually followed for the Rogolifoi Title Determination. *Id.* at 586, 595, 621, 681.

¶ 9        Rasiang and Pedro R. Deleon Guerrero ("Guerrero"), both descendants of Silvestre Rogolifoi, testified independently that they grew up traveling to As Mahetog to farm the land with their cousins and family from both branches. *Id.* at 498, 770. Rasiang testified that no family member ever told him Saralu was the land trustee, while Guerrero testified that many elderly women in the family would give instructions on the care of the As Mahetog land. *Id.* at 460, 765–9. Guerrero stated that Saralu never excluded any family members from using the property before it became part of the Retention Area and unusable. *Id.* at 789. Guerrero also testified that he never saw Saralu participate in Silvestre family gatherings. *Id.* at 795.

¶ 10       Maria Seman Camacho ("Camacho"), Saralu's granddaughter, testified about the family history she learned from Saralu as a child. Camacho stated that Saralu told her that the family of Silvestre lived on land separate from the As Mahetog properties. Tr. at 851–2. Camacho also stated that her father told her how he and Rita would walk from Garapan to the property to collect crops. *Id.* at

840–41. Camacho explained that her grandmother told her the As Mahetog property belonged to Rita and was given to her as a homestead by the German government. *Id.* at 846. Camacho would visit Saralu, who was living in As Mahetog, with her cousins from Rita's lineage only. *Id.* at 867. She further testified that she did not see any of Silvestre's family on the land while growing up, nor did she hear that they claimed an interest in the land until recent years. *Id.* at 881–84.

¶ 11     Following numerous motions from both parties over a period of more than three and a half years, the trial court issued an order granting a Judgment on Partial Findings. Ex. F ("Order") at 20. The court made numerous findings of fact relating to testimony from the evidentiary hearing. The court determined that Rita inherited the land from her father Pedro, and therefore the distribution of the land was guided by Carolinian customary law. *Id.* at 10. Without evidence that Rita or Pedro intended to depart from custom, the court states the Title Determination was made in error and title should have belonged to the heirs of Pedro Rogolifoi—including Silvestre and his progeny. *Id.* at 16.

¶ 12     The court held that Silvestre's heirs were not put on notice that Saralu was not acting as their customary trustee, a position which she should have held for all of Pedro's heirs as the eldest daughter of the broader family. *Id.* at 17–18. The court found it dispositive that the Title Determination stated only that public and private notice that Rita's heirs were claiming the land was given. The court reasoned that such notice would not alert Silvestre's heirs of a claimed interest in the land being averse to their own, since the 1944 Statement of Ownership listed the land as being inherited from Pedro. *Id.* at 17. The court used this lack of notice as grounds to determine that the statute of limitations, 7 CMC § 2502, did not begin to run in 1953 with the Title Determination, and therefore did not find Silvestre Estate's claims to be time-barred. *Id.* at 19. The court did not address Rita Estate's further claims of administrative res judicata or laches, and held that Silvestre Estate was entitled to one-half of the As Mahetog property and its proceeds. *Id.* at 20. Rita Estate timely appeals.[1]

## II. JURISDICTION

¶ 13     A judgment on partial findings pursuant to Rule of Civil Procedure 52(c) is a final judgment.[2] *Antonio v. Baek*, 2023 MP 02 ¶ 9. We have appellate jurisdiction over final judgments and orders of the Commonwealth Superior Court. NMI CONST. art. IV, § 3.

## III. STANDARDS OF REVIEW

¶ 14     We address two issues on appeal. We first consider whether the court erred

---

[1]     Although signed and dated October 11, 2022, the Order was not entered until January 27, 2023, after Silvestre Estate's counsel emailed court clerks enquiring about the status of the case. As this Notice of Appeal was filed on February 22, 2023, we find the appeal timely. NMI SUP. CT. R. 4(a)(1).

[2]     Because this action was filed in 2018, the 2014 Rules of Civil Procedure still apply.

in finding that the Silvestre Rogolifoi family was not on notice that the Title Determination did not grant them an interest in the property because they believed Dolores Saralu was the trustee for the property under Carolinian customary law. As a mixed question of law and fact, this is reviewed de novo. *In re Estate of De Castro*, 2009 MP 3 ¶ 28. The second issue is whether the statute of limitations found in 7 CMC § 2502 required the court to dismiss the claim that there was insufficient notice in 1953. We also review issues of statutes of limitation de novo. *Albia v. Duenas*, 2022 MP 3 ¶ 5.

### IV. DISCUSSION

¶ 15    The Trust Territory of the Pacific Islands had an established policy and process of determining ownership for lands that were or had been previously occupied by the government and endeavored to return such lands to the proper owners.[3] *In re Estate of Dela Cruz*, 2 NMI 1, 9 (1991). The policy of returning land began on December 29, 1947 with the promulgation of Policy Letter P-1.[4]

¶ 16    The Deputy High Commissioner stated that all land decisions made by foreign governments prior to March 27, 1935 would be held as binding while transfers after that date would be invalid if made "from the public domain to Japanese" entities or reviewed for their validity individually if made by private owners to Japanese entities. Policy Letter at ¶ 10–13, Ex. S at 3. Land was to be returned to the native owners "at the earliest date possible" and if the land needed to be retained for government use, it was to be exchanged for other land. Policy Letter at ¶ 14–17, *Castro v. United States*, 500 F.2d 436, 550–51 (Fed. Cir. 1974).

¶ 17    The procedure to effectuate this policy came through Land Management Regulation 1, promulgated by the Office of the Trust Territory High Commissioner. *Estate of Dela Cruz*, 2 NMI at 9. The Trust Territory employed Land Title Officers who "were empowered to determine land ownership and to release the lands so determined to their respective owners." *Id.* The comprehensive procedure was standardized for all title determinations and clearly set out in the Regulation. *Id.*

¶ 18    Relevant to this appeal, the Land Title Officers of the Trust Territory were also authorized to appoint a land trustee to administer the land of a decedent for interested persons. *Id.* at 9–10. In this procedure and the similar registration processes of former governments, the eldest woman in a Carolinian family would serve as the trustee for property collectively held by the women of the family.

---

[3]    Primary records have unfortunately been largely unpreserved. When unavailable, as necessary, we turn to secondary sources that include the Trust Territory laws in publications by the Trust Territory, its employees, and similar entities. *In re Estate of Rangamar*, 4 NMI 72, 75 (1993); *Sablan v. Cabrera*, 4 NMI 133, 140 n.44 (1994).

[4]    Trust Territory Policy Letter P-1 from Deputy High Commissioner, Trust Territory of the Pacific Islands, to Civil Administrators of Saipan, Truk, Ponape, Majuro, Kwajalein, Palau and Yap at 17 (Dec. 29, 1947) (hereinafter "Policy Letter"), as cited in *Castro v. United States*, 500 F.2d 436, 550–51 (Fed. Cir. 1974), *Sablan*, 4 NMI at 142 n.56, and Ex. S.

*Estate of Rangamar*, 4 NMI at 76 n.12. Contemporary reports on the land tenure of Carolinian families in the Trust Territory indicate that when a land trustee died, the land title was then transferred to the next eldest woman, such as the oldest surviving sister or daughter. *Id.* at 76 n.13.

¶ 19    The title determinations made by Land Title Officers are binding quasi-judicial administrative orders. *Estate of Dela Cruz*, 2 NMI at 10. Regulation 1 specified that title determinations were appealable within one year after their filings. *Id.* We have found in numerous cases that non-appealed title determinations are final as res judicata. *See, e.g.*, *Flores v. Commonwealth*, 2004 MP 9 ¶ 11. We begin our analysis of Title Determination 667 and the Rogolifoi claims, however, with the merits of the Order before us.

> *A. Rogolifoi family members were provided adequate notice of the Title Determination granting ownership to the heirs of Rita Rogolifoi only.*

¶ 20    The trial court hinges its order on the finding that the heirs of Silvestre Rogolifoi would have had no notice that Saralu was not holding the As Mahetog property in trust for them and their descendants consistent with Carolinian customary law. Order at 10. In analyzing whether Silvestre's heirs would have had notice, the court makes findings of fact that extended family members would not have received public or private notice that title was being granted adverse to their interest and contrary to Carolinian custom, based on witness testimony. *Id.* at 18–19. While reviewing judgments made under Rule 52(c), we must give findings of witness credibility by the trial court "due regard" and set aside findings of fact only if clearly erroneous. Com. Civ. Pro. R. 52(a). Beyond this requirement, lack of notice is reviewed de novo. *In re Estate of De Castro*, 2009 MP 3 ¶ 28.

¶ 21    We read title determinations from the Trust Territory administration at face value. The Ninth Circuit in *Aldan v. Kaipat*, 794 F.2d 1371 (9th Cir. 1986), found "no basis . . . for doubting the Land Office's declaration that proper public and private notice had been given. The Land Office's proceedings, so far as they are observable in this case, complied with the requirements of due process." *Id.* at 1372. The title determination in *Aldan* contained the same language about public and private notice as the Rogolifoi Title Determination. *See id.*, Ex. O at 1. *Aldan* affirmed a trial court judgment denying the due process claims from the heirs of a previous landowner who alleged she had no notice of the title determinations. *Aldan*, 794 F.2d 1371 at 1372. Ninth Circuit cases, particularly when sitting on appeal from the Commonwealth Trial Court and interpreting the same administrative action as before us, are greatly persuasive. *See Flores v. Commonwealth*, 2004 MP 9 ¶ 19 (relying on *Aldan*'s statement that claims of deprivation of notice were baseless based on the face of the title determination).

¶ 22    *Aldan* is further supported by persuasive authority from the Appellate Division of the NMI District Court, finding that Trust Territory Determinations of Owners, as administrative adjudications, enjoy a presumption of regularity. *In re Estate of Taisakan* 1 CR 326, 335 (1982 NMI App. Div.). When considered in tandem with binding authority, *Aldan* and *Taisakan* make clear that title

determinations are presumed to provide adequate notice for due process and should be understood based on their plain interpretation.

¶ 23    In *In re Estate of De Castro*, this Court found that a title determination listing De Castro as the property owner was sufficient to put the family on notice that De Castro was, in fact, the owner. 2009 MP 3 ¶ 33. Following a similar fact pattern as that which is presented in this case, the eldest daughter of a woman recognized as the owner of property in a Trust Territory Title Determination executed a quitclaim deed as the family's "land trustee" exchanging lots with the Trust Territory government. *Id.* at ¶ 4. Twenty-six years after that exchange, the same trustee registered the new lot with the Land Commission under her own name, using supporting documents indicating she represented the estate of her mother. *Id.* at ¶ 5. The trustee, and her son following her death, disputed the Commission's finding that all of her mother's heirs owned the land, and argued that she inherited the land from her father's family and not her De Castro lineage. *Id.* at ¶ 8. The Court noted that the trustee herself signed documents for the land exchanges as "representing Pilar de Castro, as Land Trustee." *Id.* at ¶ 33. Finding that the supporting documents from the Land Determination and her own signatures on the quitclaim deed undermined her claim of sole ownership, the Court upheld the Commission determination that she owned the land as trustee for the De Castro family. *Id.* at ¶ 36. *De Castro* instructs that, when presented with issues of notice, we read the language of title determinations plainly to grant ownership exactly as is written on the determination and no broader.

¶ 24    This Court has only set aside a title determination once. In *In re Ogumoro*, we found the title determination naming the heirs of the son, rather than the father, was patently unsupported by the record. 4 NMI 124, 128 (1994). The record at the time of the title determination included three statements made by the father's other two sons, each stating that only one of the three sons owned the land, with the third statement including that the land was inherited by the eldest son from their father in 1910. *Id.* at 125–6. The Court reasoned that these statements were actually not in conflict, that the third statement evinced that the youngest son believed he shared ownership of the land with his brother's children, and that they could not support the title determination's decision when read together. *Id.* at 128. Notably, however, the Court found that the land in question was not Carolinian family land, but owned individually by the father. *Id.*

¶ 25    Unlike *Ogumoro*, the record of notice in the Rogolifoi Title Determination is unmistakable: it states explicitly that the lands were "the property of the heirs of Rita Rogolifoi, represented by Dolores Saralu." Ex. O at 1. Based upon the language of the Title Determination, the heirs of Silvestre would not have had reason to believe that they were represented by Saralu, as they are not heirs of Rita. The title determination makes no mention of Pedro's claim to the land, nor any inheritance beyond that of Rita. Silvestre Estate alleges that their right to the property is based on their status as Pedro's heirs through Silvestre, but the title

determination cannot reasonably be read alone to grant title to anyone other than Rita's heirs.

¶ 26    During the evidentiary hearing, Togawa testified that the officer making the title determination would have had the statement of ownership on which Rita claimed she inherited from her father. Tr. at 678. As Togawa noted in her testimony, the document explaining the title determination is lost, so we do not know how the land officer determined that Rita owned the land instead of Pedro. *Id.* at 677. The officer would have known that Dolores was claiming as an heir of Rita, who was an heir of Pedro, but did not specify that the land belonged to the heirs of Pedro. Based on the evidence that the title officer had at the time of the title determination, he could have reasonably stated on the title determination document that the property came from either the Estate of Rita or the Estate of Pedro, and definitively chose the former. The trial court has wide latitude in deciding which witnesses to believe and disbelieve. *Commonwealth v. Camacho*, 2002 MP 6 ¶ 109. This Court does not "second-guess the trial court's evaluation of a witness' credibility," or "reweigh evidence presented to the trial court." *Fitial v. Kim*, 2001 MP 9 ¶ 18. We therefore, in our examination of the notice issue, accept the trial court's reliance on Togawa's testimony about the Title Determination process.

¶ 27    With only the Title Determination stating that Rita's heirs own the land, no documents indicating Pedro's or Silvestre's ownership of the land would have been available on the public record. Therefore, Silvestre's heirs would have had public notice that the property was not judged to be owned in any part by them. Parties during appellate argument stated that no record of the form or manner of public and private notice as stated in the Title Determination exists, nor was it presented to the trial court during the evidentiary hearing. Regardless, the Title Determination plainly states that such notice was given.

¶ 28    Furthermore, Regulation 1, governing Return of Lands to Owners, gives guidelines for what notice was provided for the return of land to owners under the Trust Territory.[5] Regulation 1 requires the following of all notices for ownership hearings:

> Each notice shall contain a statement of time and place of the hearing, a brief but clear description of the land or lands to be considered [at the hearing], the names of the owners of record (if any), the names of all claimants of record, and such other information as the title officer determines to be necessary to give full notice of matters to be considered. . . . Public notice shall be

---

[5]    Land and Claims Regulation 1 (Amended) § 6, *as reprinted in* Dep't of Navy, Report on the Trust Territory of the Pacific Islands for the Period July 1, 1950, to June 30, 1951 Transmitted by the United States to the United Nations, Pursuant to Article 88 of the Charter of the United Nations (June 1951), at 189–92, https://www.cia.gov/readingroom/docs/CIA-RDP58-00453R000100300013-8.pdf (last visited June 28, 2024) ("Regulation 1").

> given by posting in a public place at the Civil Administration headquarters [("CIVAD Headquarters")], in the municipality in which the land is located, and, where practicable, on the land to be considered. . . . Private notice shall be given to all parties of record by delivery of a copy of the notice to the party or to his last known place of residence.
> Regulation 1 § 6.

This explanation of public and private notice matches witness testimony by Togawa and Agulto in the evidentiary hearing, as well as the statement included in the Title Determination itself. Tr. at 302–3, 586, Ex. O at 1.

¶ 29    Moreover, Regulation 1 provides a form Determination of Ownership that is identical to the form used in the Rogolifoi Title Determination. *Id*. at § 9. The regulation states that the completed title determination would be distributed with the original copy "to owner; executed copies to Clerk of Courts, to title officers file and High Commissioner; *certified copy posted in a public place at CIVAD Headquarters*; copy to CIVAD file." *Id.* (emphasis added).

¶ 30    This explanation of notice and publication persuasively supports that Silvestre's heirs would have received notice that the land was owned by Rita alone, not Pedro or Silvestre. The notice posted publicly before any hearing on ownership of the As Mahetog property would have stated the names of both owners and claimants of record, if available. *Id.* at § 6(a). Consistent with the trial court's own findings of fact that both the owner and claimant of record would be Rita, heirs of Silvestre would have had notice that only Rita was being considered an owner. *See* Order at 6–8 (finding that Rita started the claim for the property with her 1944 Statement of Ownership). Posting of the certified Title Determination at the public CIVAD Headquarters after the hearing would have only further confirmed that the As Mahetog property was not owned by heirs of Silvestre, as neither Silvestre nor Pedro's names appeared anywhere on the form document. There was public notice that Saralu was acting as trustee only for the heirs of Rita, not her larger extended family.

¶ 31    By claiming a lack of notice, Silvestre Estate attempts to style a due process violation for the Title Determination to allow for the claim of half ownership of the As Mahetog land. "Mere lack of notice of an administrative proceeding to determine ownership of real property does not result in a due process violation" and is insufficient to attack a title determination. *Estate of Muna v. Commonwealth*, 2000 MP 2 ¶ 9 (citing *In re Estate of Mueilemar*, 1 NMI 441, 446 (1990) and *Sablan v. Iginoef*, 1 NMI 190, 198 n.3 (1990)). Distinct from the issue in *Muna*, Silvestre Estate alleges—and the trial court held—that the lack of notice occurred only insofar as the heirs of Silvestre did not know that Saralu was not acting as their customary land trustee.

¶ 32    Carolinian custom dictates that land be held in trust matrilineally by the eldest woman in the family. *See, e.g.*, *In re Estate of Rangamar*, 4 NMI 72, 75 (1993). The court's finding of lack of notice hinged upon the fact that Saralu, as

the eldest woman in the entire Rogolifoi family in 1953, would have served as the customary trustee for both Rita and Silvestre's heirs. Carolinian custom of appointing a land trustee on behalf of a decedent does not negate that the Title Determination specified that Saralu was a trustee only for her mother's heirs. Ex. O at 1. The trial court found that the Title Officer would have known that Saralu was not the original trustee because of the Statement of Ownership, as Togawa testified. Order at 6–8; *see* Tr. at 678. Saralu replaced her mother as trustee upon Rita's death in 1952 because Rita claimed the land through her father Pedro. Ex. M; Ex. U.

¶ 33    Testimony from the evidentiary hearing is inconclusive that Saralu actually served as trustee for Silvestre's heirs. Numerous members of the Rogolifoi extended family testified about family life and use of the land by both halves of the family after the title determination was made, but did not specify that the two families interacted apart from the children at times. Tr. at 498–500, 769–72, and 851–852. Rasiang testified that no one ever told him Saralu served as customary trustee for Silvestre's heirs. Tr. at 460. Furthermore, Guerrero gave testimony that Saralu was reserved from the rest of the family, and Camacho stated that only cousins in the Rita lineage would visit with Saralu in As Mahetog— facts which do not inherently support the notion that she represented the heirs of Silvestre alongside the heirs of Rita. Tr. at 795, 867.

¶ 34    Factual inconsistencies between the parties' different theories of ownership require that we rely on the language of the Title Determination directly. To do otherwise would be to speculate about things we have no way of knowing. Rita's 1944 Statement of Ownership and her daughter Saralu's later statement are in direct conflict: Rita claimed she gained the property from her father in 1886 while Saralu says her mother got the land directly from the German government. *See* Ex. M at 1, *and* Ex. N at 1. Testimony from the evidentiary hearing provides no clear, uncontroverted proof of either statement. Regardless of whether Silvestre's heirs presumed Saralu was their Carolinian customary trustee, the title determination stated explicitly that the land belonged to Rita Estate. Silvestre Estate had notice of this determination based on the face of the Title Determination and the procedure published in Regulation 1. Whether the title officer was incorrect in his determination or whether Silvestre's heirs did not understand the significance of the determination are not questions of adequate notice. We do not have enough uncontested, non-speculative evidence to support the trial court's determination that there was no notice.

¶ 35    Silvestre's heirs should have known that they were not included as owners of the As Mahetog property solely by Saralu being the testator because no ancestor of their line was named in the title determination. It is inconsistent with our precedent and modern understandings of the land claims procedure to read beyond the face value of the title determination. Public and private notice prior to the hearing and public notice after the determination all would have stated that Rita Estate—not Pedro or Silvestre Estate—was the owner. Regulation 1 § 6, § 9; Ex. M at 1. Without naming an estate to which the heirs of Silvestre belong,

notice that Saralu was serving as *a* trustee for the land would have been irrelevant to Silvestre Estate. Rita Rogolifoi being named as the sole owner should have put the heirs of Silvestre on notice that they were not owners, despite the trial court's finding that such would not have been notice Order at 17. Because the title determination was clear that only the heirs of Rita would take ownership of the property, the court erred in determining that the heirs of Silvestre had no notice.

*B. The statute of limitations bars any claim that the 1953 Title Determination lacked adequate due process.*

¶ 36    The trial court held that, because the Silvestre heirs lacked notice, Silvestre Estate's claims could not be time-barred by the statute of limitations. We review de novo. *Albia v. Duenas*, 2022 MP 3 ¶ 5.

¶ 37    Regardless of the validity of the claim for lack of notice, it is distinctly barred by the statute of limitations. This Court and the Ninth Circuit have both held that the twenty-year statute of limitations bars due process claims. *Flores v. Commonwealth*, 2004 MP 9 ¶ 21 ("Here, even if there was a cause of action, it accrued in 1955 when the second title determination became final. Flores, then, is thirty years too late in bringing this case."); *Aldan v. Kaipat*, 794 F.2d 1371, 1372 (9th Cir. 1986) ("The general statute of limitations on actions for the recovery of land requires commencement of the action within twenty years of its accrual, . . . so that even if Vicenta Rapugao had been deprived of notice in 1953 or 1956 her claim would by now have lapsed.").

¶ 38    Silvestre Estate's claim of lack of notice is a claim of due process violation in an administrative proceeding that occurred 71 years ago. *See Flores*, 2004 MP 9 ¶ 19 (citing *Aldan*, 794 F.2d at 1372). This claim is, however, unique in that it relies on Carolinian customary law. The purported lack of notice does not arise from a lack of notice to the public or private parties of record, but to family members represented by their claimed family land trustee. Although colored by Carolinian custom, this issue is still a claim for a violation of due process for the heirs of Silvestre. Due process claims are subject to the statute of limitations. *Id.*

¶ 39    To understand the context of this due process claim at the time it accrued, we must turn to the laws of the Trust Territory. The statute of limitations, 6 TTC § 302, declares that an action for the recovery of land must begin within 20 years after the cause of action accrues, and allows descendants to make the claim on behalf of their ancestors. The statute went into effect on May 28, 1951. *Armaluuk v. Orrukem*, 4 TTR 474 (1969). The Commonwealth statute of limitations, 7 CMC § 2502, is identical and sourced directly from the Trust Territory Code. Interpretations by the Trust Territory High Court for carried-over statutes are not binding, but "helpful." *Century Ins. v. Guerrero*, 2009 MP 16 ¶ 11. In Trust Territory case *Crisostimo v. Trust Territory*, 7 TTR 375, 384 (App. Div. 1976), the court held that the 20-year statute of limitations applied only to actions to quiet title and recover land. The title determination in this case was an action to recover land. This Court applies the statute of limitations to title determinations from the Trust Territory. *See Flores*, 2004 MP 9 ¶ 20.

¶ 40     The addition of a Carolinian customary law claim does not insulate a lack of notice claim from the statute of limitations. The Trust Territory recognized local customary laws and gave them their "full force and effect of law so far as such customary law is not in conflict with [laws of the Trust Territory]." 1 TTC § 102. The twenty-year statute of limitations, 6 TTC § 302, was undoubtedly a law of the Trust Territory. Under Section 102 of the Trust Territory Code, the statute of limitation would have superseded Carolinian customary law giving rise to the claim for lack of notice. The trial court erred in stating that the statute of limitations did not begin in 1953 because Silvestre's heirs were not given proper notice based on Carolinian custom. Order at 20.

¶ 41     The statute of limitations provides no exceptions to its enforcement. *See* 7 CMC § 2502. We construe the application of the statute strictly to find that the trial court clearly erred in determining Carolinian customary law prevented the heirs of Silvestre from having proper notice and hold that Silvestre Estate's claim for lack of notice was time-barred. Silvestre Estate would have needed to bring any claim for notice or other error before 1973.

### C. Administrative Res Judicata and Laches need not be addressed.

¶ 42     Rita Estate further alleges that Silvestre Estate's claims to the As Mahetog property are barred by administrative res judicata and laches. Opening Br. at 24–31. Rita Estate made these same claims before the trial court, but they were not discussed in the Order. *See* Ex. C at 4–6.

¶ 43     Administrative res judicata bars an action that has already been the subject of a final administrative decision. *Estate of Muna v. Commonwealth*, 2000 MP 2 ¶ 7. Title determinations made by the Trust Territory's Saipan District Land Office were regular administrative actions that this Court has afforded res judicata status if not timely appealed. *Flores v. Commonwealth*, 2004 MP 9 ¶ 11. The NMI Administrative Procedure Act, sourced from the Trust Territory Code, requires final agency actions be appealed within 30 days. 9 CMC § 9112(b). However, the relevant regulation in 1953 when the Title Determination was made, Regulation 1, required final agency actions to be appealed within one year. Regulation 1 § 14; *Flores*, 2004 MP 9 ¶ 11. No such appeal appears in this record, nor do the parties argue that one was made. *See* Tr. at 684. We therefore assume that the Rogolifoi Title Determination is final and could be afforded res judicata effect.

¶ 44     Despite this, there are four equitable exceptions to administrative res judicata. "An administrative adjudication such as a land title determination may be set aside only if 'it was (1) void when issued, or (2) the record is *patently inadequate* to support the agency's decision, or if according the ruling res judicata effect would (3) contravene an overriding public policy or (4) result in a manifest injustice.'" *In re Ogumoro*, 4 NMI 124, 126 (1994) (quoting *In re Estate of Dela Cruz*, 2 NMI 1, 11 (1991)) (emphasis in original). Should a court find that one of these exceptions apply, it need not find a claim be res judicata.

¶ 45     Similarly, the doctrine of laches also provides a type of flexibility in its enforcement. A party may assert laches against another if two elements are met: there is an inexcusable delay in asserting a known right and the delay prejudices the party asserting laches. *In re Estate of Rios*, 2008 MP 5 ¶ 9. "There is a presumption of laches where the statute of limitations has run." *Rios v. MPLC*, 3 NMI 512, 524 (1993). Despite this presumption, the opposing party may still rebut with evidence that either element is not met, that the delay was reasonable, or there was no prejudice. *Matsunaga v. Cushnie*, 2012 MP 18 ¶ 20. As an equitable bar, laches is not an absolute defense that would prevent a court from adjudicating a case if it so desired. Courts have discretion in applying laches, even if it finds the elements are met. *See Estate of Rios*, 2008 MP 5 ¶ 8.

¶ 46     These two issues were not subjects of the Rule 52(c) Judgment appealed here, nor are they dispositive in light of their inherent flexibility and our finding that the statute of limitations bars Silvestre Estate's due process claim. Because it would not be prudent to examine the applicability of any exceptions to administrative res judicata or any elements of laches, we decline to reach these issues.

### D. We do not reach the findings of fact on appeal.

¶ 47      Rita Estate further raises three broad issues of fact relating to ownership of the land and testimony from the evidentiary hearing. At this time, however, we decline to reach these remaining factual issues.

¶ 48     The trial court erred in its ultimate conclusion that Silvestre Estate was able to assert their claims seventy years after the original determination of ownership was made. Issues with findings of fact unrelated to the crux of the appealed order, whether there was adequate notice for Carolinian family members, are not dispositive to our holding. Therefore, we need not discuss any further issues of fact on appeal.

### V. CONCLUSION

¶ 49     For the foregoing reasons, we REVERSE the trial court's judgment finding that Silvestre's heirs lacked notice of the Title Determination, REVERSE the finding that Silvestre Estate's claims were not barred by the statute of limitations in 7 CMC § 2502, and ORDER the court enter judgment in favor of the Estate of Rita Rogolifoi.


SO ORDERED this 28th day of June, 2024.



 /s/
ALEXANDRO C. CASTRO
Chief Justice

/s/
JOHN A. MANGLOÑA
Associate Justice


/s/
PERRY B. INOS
Associate Justice


COUNSEL

Stephen J. Nutting, Saipan, MP, for Plaintiff-Appellant.

Robert T. Torres and Charity R. Hodson, Saipan, MP, for Defendant-Appellee.

*NOTICE*

*This slip opinion has not been certified by the Clerk of the Supreme Court for publication in the permanent law reports. Until certified, it is subject to revision or withdrawal. In any event of discrepancies between this slip opinion and the opinion certified for publication, the certified opinion controls. Readers are requested to bring errors to the attention of the Clerk of the Supreme Court, P.O. Box 502165 Saipan, MP 96950, phone (670) 236–9715, fax (670) 236–9702, e-mail Supreme.Court@NMIJudiciary.gov.*




**E-FILED**
**CNMI SUPREME COURT**
E-filed: Jun 28 2024 03:46PM
Clerk Review: Jun 28 2024 03:47PM
Filing ID: 73510739
Case No.: 2023-SCC-0004-CIV
NoraV  Borja

IN THE

## Supreme Court

OF THE

## Commonwealth of the Northern Mariana Islands

**IN THE ESTATE OF RITA ROGOLIFOI,**
*Plaintiff-Counter-Defendant-Appellant,*

*v.*

**IN THE ESTATE OF SILVESTRE ROGOLIFOI,**
*Defendant-Counter-Plaintiff-Appellee.*

**Supreme Court No. 2023-SCC-0004-CIV**
Superior Court Civil Action No. 18-0210-CV

## JUDGMENT

Plaintiff-Appellant Estate of Rita Rogolifoi appeals the trial court's order entering judgment of one-half ownership of property in As Mahetog and related proceeds to Defendant-Appellee Estate of Silvestre Rogolifoi. For the reasons discussed in the accompanying opinion, the Court REVERSES and ORDERS the court enter judgment in favor of the Estate of Rita Rogolifoi.

ENTERED this 28th day of June, 2024.

/s/ _____
JUDY T. ALDAN
Clerk of the Supreme Court